1809.
────────
Pittsburg,
Tuesday,
September 12.

STEWART *against* FOSTER and others.

IN ERROR.

An *alien*, who has resided in *Pittsburg* one year next preceding an election for borough officers, and has within that time paid a borough tax, is entitled to vote at such election.

THE plaintiff, at an election for borough officers in the borough of *Pittsburg*, in *March* 1809, offered his vote, he being a freeholder in the borough, and having resided therein one year immediately preceding the election, and within that time paid a borough tax. The defendants, who were the inspector and judges of that election, refused the vote upon the ground that the plaintiff was not a citizen, and was not entitled to vote for members of the general assembly.

A case was thereupon made for the opinion of the Common Pleas of *Allegheny*, to try the plaintiff's right; and the judgment of that court being in favour of the defendants, it was brought for revision to this court, by writ of error. (*a*)

(*a*) There were two descriptions of persons whose votes were offered and rejected at the borough election in *March* 1809. FREEHOLDERS within the borough, who had resided therein at least one year preceding the election, and within that time paid a borough tax; and INHABITANTS of the borough, who had resided and paid taxes in the same manner as the freeholders. The cases were brought separately before the Common Pleas of *Allegheny*, but neither in that court, nor in this, was there supposed to be any difference between the elective franchise of the different plaintiffs. The opinion of the president of the Common Pleas, was as follows:

*Roberts*, President. I shall consider the two cases together, inasmuch as they vary in but one point, and *that* being in my view, altogether immaterial to the decision. A freehold estate can confer no right of voting on those whose situations, in other respects, are incompatible with the enjoyment of the elective franchise.

The question then submitted to the consideration of the court is, *whether an* ALIEN, *having resided in Pittsburg one year preceding an election for borough officers, and having, within that time, paid a borough tax, is entitled to vote at such election.*

Whether such right exists or not, will depend on the construction of the act of incorporation passed 5th *March* 1804; (*a*)* and perhaps also upon the " act for the further regulation of the borough of *Pittsburg*," passed 7th *March* 1805.(*b*)

* (*a*) 6 *State Laws* 199.                    (*b*) 7 *State Laws* 103.

The point was here argued by *Mountain* for the plaintiff, and by *Wilkins* for the defendants; but as the question turned

The words of the act of the 5th *March* 1804, are—" the *freeholders,* " *housekeepers, and other inhabitants* of the said borough, who have resided " within the same at least one year, immediately preceding the election, " and within that time paid a borough tax, shall have power to elect, &c.

It will not be contended that the words " *freeholders, housekeepers and* " *other inhabitants,*" used in the act, are to be understood in their most extensive import; for if they were so understood, not only alien friends and alien enemies might be included, but also women, minors, apprentices, slaves and servants for years: therefore it is evident, that the letter of the act must be restrained by an equitable construction.

This mode of construing statutes is perfectly familiar to every lawyer.

In some cases the *letter* of a statute is *restrained* by an equitable construction; in others it is *enlarged;* in others the construction is contrary to the letter. (c)

That equitable construction which *restrains* the letter of a statute, is defined by *Aristotle* in this manner: *Equitas est correctio legis generatim latæ, quâ parte deficit,* or as the passage is explained by *Perionius*—*Equitas est correctio quædam legi adhibita, quia ab ea abest aliquid propter generalem sine exceptione comprehensionem.* (d)

The words of 2 *West.* 2. c. 11. are general, that all bailiffs and receivers, who in passing their accounts before auditors assigned, shall be found in arrear, may be committed to the next jail: (e) yet, if an infant bailiff or receiver be found in arrear, he shall not be committed; for he is not, by reason of his want of discretion, within the equity of the statute.

The intention of the makers of a statute is sometimes to be taken from the cause, or necessity of the making of a statute; at other times from the circumstances. Wherever this can be discovered, it ought to be followed with reason and discretion in the construction of the statute, although such construction seem contrary to the letter. (f)

As means of discovering the intent of the legislature, it is proper to consider, 1st, What the law was previous to the making of the statute; 2d, The mischief which then existed, and which was intended to be remedied; 3d, The remedy which is provided for the mischief; and 4th, The true reason of the remedy.

These latter rules will apply when we come to consider the act of 7th *March* 1805.

It appears by recurring to the act of incorporation of 5th *March* 1804, that amongst other things it was required, that the voter should have paid a borough tax, within one year immediately preceding the election. Thus it was put in the power of the corporation, to exclude from the right of voting, all persons except those who were freeholders within the borough. And we find that the corporation were not backward in using this power; for at a meeting of the burgesses and town council, under this act, which took place on the 24th *April* 1804, and by the 27th ordinance passed

(c) 4 *Bac. Abr.* 649.—Tit. Stat. I. 6.      (d) *Plow.* 465. *Eyston* v. *Studde.*
(e) 4 *Bac. Abr.* 649.—Tit. Stat. I. 6.      (f) *Plow.* 205.

1809.

STEWART
v.
FOSTER.

exclusively upon the construction of certain acts of assembly, which are particularly stated and explained in the opi-

after the making of the act, it is provided " *that all borough taxes shall be* " *levied and assessed on real property only.*" (g)

It was calculated to excite alarm and dissatisfaction in the minds of citizens, who were gratified to vote at general elections, and some of whom might be seized of valuable freeholds in other parts of the state, thus to find themselves deprived of the elective franchise, in the little community wherein they happened to reside; more especially when they must have seen that the act of incorporation seemed not intended to exclude them, though it might inadvertently have furnished the means.

This exclusion of citizens who held no freehold estate within the borough, was probably the grievance or mischief complained of, and intended to be remedied by the act of 7th *March* 1805, which provides " that the " inhabitants of the borough of *Pittsburg*, who shall have resided within " the same six months, immediately preceding the election, *and who shall* " *in other respects be entitled to vote for members of the general assembly,* " shall be fully competent to vote at the elections of officers, for said bo- " rough. (h)

This " act for the further regulation of the borough of *Pittsburg*," is on the same subject with the act of 5th *March* 1804. (i)

Now it is a well known rule, in the construction of statutes, that all which relate to the same subject, notwithstanding some of them may be expired, or are not referred to, must be taken into one system and construed consistently. (k)

It has been contended, on behalf of the plaintiffs, that it is inconsistent with the spirit of laws for the incorporation of boroughs, to exclude aliens from the elective franchise; and that in *Europe* they enjoy it. If such be the law in any part of *Europe*, or if amongst any civilized nation existing, aliens of every description are permitted to interfere in municipal regulations, it has not been shewn, nor have we been able to discover it.

It is true that foreigners may become members of certain corporations established in *England*, as well as in this country, for the purposes of car-

(g) *Ordinance book,* p. 68. *Ord.* No. 24.

(h) 7 *State Laws* 103.

(i) The act of 7th *March* 1805 seems to have been passed in consequence of a petition of a number of the inhabitants of *Pittsburg*, presented by Mr. *Robinson* in the house of representatives, the 15th *February* 1805, in which it seems the grievance complained of was, that housekeepers and others qualified to vote at general elections, not being freeholders, were not permitted to vote for borough officers. And it is remarkable that the petitioners pray that the *ordinance* (probably meaning that whereby they were excluded) might be repealed by an act of the legislature. Min. of the H. Representatives, p. 337.

At the next meeting of the town council after the passing of the act of 7th *March* 1805, to wit, on the 6th *April* 1805, the ordinance of the 24th *April* 1804 was repealed. *Ord. book,* p. 60.

(k) 4 *Bac. Abr.* 647. Tit. Stat. I. 28.

nions of the judges, it becomes the less important to give a note of the argument.

rying on trade, manufactures, or commerce; and may possibly be admitted, in some instances, to enjoy like privileges in such private communities, with other members who are citizens. In the few instances, however, which have fallen under my notice, in the *United States*, and in the state of *Pennsylvania*, they are *excluded* from such privileges, even in such private associations, of which the interest of the community seemed to require, that they should be invited to become members.

Thus by the act incorporating the bank of the *United States*, none but citizens are eligible as directors.

In the bank of *Pennsylvania*, none but stockholders, being citizens of the commonwealth, are eligible as directors: nor can any other act as a proxy.

In the bank of *Philadelphia* a like regulation is established.

And in the "Farmers and Mechanics' bank", (established at the last session of the legislature) none but stockholders being citizens, are eligible to the directorship.

Now, if in these private associations, it is not considered expedient to put aliens upon a footing with citizens, how much more cogent are the reasons for excluding them from participating with the citizens, in regulating the affairs of corporate towns?

The incorporation of towns has for its object, municipal regulation; the laws which apply to the state at large, being inadequate to the regulation of the interests and local concerns of a number of men collected together in small communities, and pursuing modes of life different from the rest of their fellow citizens.

Every such community hath the power to regulate trade, and the conduct of all residing within their precincts. It is true their laws or ordinances must not be *contrary* to the laws of the state, but they may be, and frequently are variant from them.

There are in *Pennsylvania* upwards of thirty incorporated towns. What an influence would be placed in the hands of foreigners, if they were permitted to legislate, or to elect those who should legislate in so considerable a portion of the country!

Indeed, in most instances we find them excluded by the acts of incorporation, in which it is usual to declare that the election of borough officers shall be made by the inhabitants *qualified to elect members of the legislature*. (*l*)

If we consider the rights of an alien according to the law of nations, and according to the common law, it will be evident that nothing less than an explicit provision in a statute could confer on him the rights of an elector, which seem altogether incompatible with his situation.

An alien is either an *alien friend*, or an *alien enemy*; he may be the one and the other at different periods of his residence, as the country to which he belongs may be at war or in peace with the nation in which he resides.

"The citizen, or the subject of a state who absents himself for a time,

(*l*) 5 *State Laws* (Carey and B.'s ed.) 42. 54. 75. 169. 203.—6 Vol. 107. 230. 251.—7 Vol. 39. 268.—8 Vol. 36. 40. 51. 106. 147.

TILGHMAN C. J. The question to be decided is, whether an *alien*, having resided in *Pittsburg* one year next prece-

STEWART
*v.*
FOSTER.

" without any intention to abandon the society of which he is a member,
" does not lose his privilege by his absence; he preserves his rights, and
" remains bound by the same obligations. Being received in a foreign
" country, in virtue of the natural society, the communication and com-
" merce which nations are obliged to cultivate with each other, *he ought*
" *to be considered there as a member of his own society and treated as such.* (m)
        " Strangers ought to be subject to the laws." " I mean," says *Vattel*,
" the general laws made to maintain good order, *and which have no rela-*
" *tion to the title of citizen or subject of the state.*" (n)

By the common law, an alien cannot hold lands; for if he purchase, (up-
on office found) the king shall have the land. So if the alien die, the free-
hold and inheritance are thrown upon the king. (o)

He is incapable of leasing lands, pastures, &c. for years: But there is a
diversity, as to the leasing of a house for the habitation of a merchant
stranger, whose sovereign is in league with the king of *England.* (p)

Neither is an alien capable of holding lands in *Pennsylvania*, except he be
an alien friend, who, previously to the purchase of lands, *hath declared his
intention to become a citizen of the United States.*

If you clothe an alien with the character of a citizen, you of course sub-
ject him to the penalties to which citizens are liable, for refusing to dis-
charge the duties of a citizen. This is no less absurd than unjust, as res-
pects the foreigner, if done without his concurrence. He may have no wish
to become a citizen of your country, or to renounce the allegiance which
he owes elsewhere, or to abandon a country to which he may be attached
by every tie. Will you compel this sojourner to exercise the rights of a
citizen, and to perform the duties of one?

As to exercising the right of suffrage, it may be said this is voluntary;
and to allow any one to exercise it is a privilege of which he may, or may
not avail himself. But when you say he may not only elect, but be elected,
you at once subject him to the penalties which may be imposed on per-
sons elected who refuse to serve.

In what situation then, is a foreigner placed? Perhaps no earthly consi-
deration might be sufficient to induce him to expatriate himself; yet be-
cause he happens to be found in one of your incorporated towns, you com-
pel him to undertake an office, and in order to qualify himself, to take an
oath to support your constitutions, or subject him to heavy penalties for
refusing to do so.

Hospitality towards strangers is a trait, as amiable in the character of a
community as in that of an individual. It may be consistent with a liberal
policy to admit foreigners to the rights of citizenship upon easy terms;
but the warmest advocate for affording facility to foreigners in acquiring
the rights of citizenship, it is presumed, would not be in favour of *compel-
ling* men to become citizens; but would at least think it right that the fo-
reigner should declare his *willingness* to become a citizen, and give some

(m) *Vattel* 269. § 107.                    (o) *Co. Litt.* 2 b.
(n) *Ib.* 267. § 101.                       (p) *Ib.* 2 b.

ding an election for borough officers, and having paid a bo-
rough tax within that time, is entitled to vote at such elec-
tion.

pledge of fidelity to the country, before the right should be conferred on
him.

The varying of the language, in the act of 5th *March* 1804, in declaring
who shall *elect*, and who may *be elected*, affords the most plausible argu-
ment in favour of the plaintiff; and seems to have given rise to the doubts
which one of the gentlemen, who was one of the judges of the election,
has expressed to the court on the subject.

That act declares that " the *freeholders, housekeepers* and *other inhabit-*
" *ants*" of the borough of *Pittsburg* who have resided, &c. shall have
power to elect by ballot, one reputable *citizen* residing therein, who shall
be styled " *the burgess*" of the said borough, and thirteen reputable *citizens*
to be a town council, and one reputable *citizen* as high constable; all of
whom shall be freeholders in said borough.

It is doubtless a rule of the common law, that in the construction of sta-
tutes, *every part ought to be taken into consideration, so that no clause,*
sentence or word, shall be superfluous, void or insignificant. (*q*)

This rule however, it is conceived, ought to be applied with great cau-
tion, to statutes inartificially drawn; otherwise in place of leading us to
the real meaning of the statute, or truly explaining the minds of the ma-
kers, it will, in all probability, involve us in a labyrinth of confusion and
perplexity.

If a statute were drawn by a lawyer, he would, in all probability, sel-
dom vary the expression, without intending to vary the meaning, whate-
ver monotonous appearance might thereby be given to the style; but it
would probably be otherwise with men unaccustomed to confine them-
selves to technical language.

In respect to laws for the incorporation of boroughs, and private acts,
far less correctness and perspicuity is to be looked for in them, than in
those which concern the state at large.

Whatever weight this variation of language, in the act of *March* 1804,
might be entitled to, if that act stood alone, we shall perceive that it can
have none, when all the laws on this subject are, as they ought to be,
taken into view.

If in the first act of incorporation, the legislature have used the same
words that are found in the act of 5th *March* 1804, it is presumed that
they have the same meaning in both acts.

Now in the first act passed 23d *April* 1794, it is declared that the
" *freeholders, and other inhabitants, housekeepers*" in the said borough, shall
have power to elect *two fit persons* to be burgesses of the said borough,
who shall be freeholders therein; and also to elect four *suitable persons* as-
sistants; and also to elect a high constable and town clerk, who shall be
*residents* in the said borough. (*r*)

It is presumed, if aliens are comprehended in the words of the act of
1804, they are also comprehended in the same words in the act of 1794;

(*q*) 1 *Show.* p. 108. *Plow.* 365. *Co. Litt.* 381.      (*r*) 3 *State Laws* 589.

1809.

STEWART
v.
FOSTER.

This will depend on the construction of the several acts of assembly upon that subject.

and of course under that act were eligible to office, as well as qualified to elect others. If qualified *to be elected*, they may be liable to penalties for refusing to serve; which, as has already been remarked, would be cruel and unjust. But other difficulties occur. Suppose an alien elected to the office of *constable*. As *constable*, the election laws may require his agency in the general elections. It may be his duty to hold an election for inspectors of the general election, at which election for inspectors he sits as a judge; yet *as an alien*, the same laws forbid his interference at general elections under a penalty of thirty dollars.

Further, if by the act of 1794, this privilege be conferred on aliens residing in *Pittsburg*, it was likewise conferred on aliens residing in *Harrisburg*, by the first act incorporating that borough, passed 13th *April* 1791, in which the same words, *freeholders* and *inhabitants* are used; who are thereby authorized to elect two *able freemen* of the inhabitants to be burgesses, &c. (s)

And if by that act, *aliens* residing in *Harrisburg*, were entitled to the privileges of electing and being elected, the legislature have deprived them of both these privileges, at the session before last; for by an act passed on the 1st *February* 1808, (8 *State Laws*, p. 20.) the first act of incorporation is repealed; and by this second act, the right of *electing* as well as *being elected*, is confined to the freeholders, housekeepers and other inhabitants *qualified to vote for members of the general assembly*.

It is a remarkable fact, and proves almost to demonstration, the *intention* of the legislature, in relation to this subject, that since the month of *March*, in the year 1794, TWENTY-SIX boroughs besides *Pittsburg*, have been incorporated, or have had their charters of incorporation altered; and in the acts which have been passed for these purposes, the legislature have in every instance, without a solitary exception, confined the right of voting for borough officers, to THE INHABITANTS QUALIFIED TO VOTE FOR MEMBERS OF THE LEGISLATURE.

It seems also worthy of remark, that the act to incorporate SOMERSET, was passed on the 5th *March* 1804, *the same day* on which the act to incorporate *Pittsburg* was passed, and that by the former act, the right to vote for borough officers, is confined to those of the inhabitants who are *qualified to vote for members of the legislature*. Is it conceivable that the legislature meant to confer the elective franchise on aliens resident in *Pittsburg*, at the moment they withheld it from aliens resident in *Somerset?*

Is then this intention of the legislature, so frequently, so uniformly, and so plainly indicated, to be thwarted by a variation of expression, which happens to be found in a solitary act?

Is it required by justice or good policy, that aliens of every description (as well those who may intend to become citizens, as those who have no such intention) residing in boroughs, should be privileged to vote for borough officers? I am not prepared to say it is: especially because saying so would be asserting that, at least in *twenty-six* cases out of *twenty-seven*,

(s) 3 *State Laws* 32.

*Pittsburg* was first erected into a borough by an act passed the 22d of *April* 1794, 3 *St. Laws* 588. By the second section of this act, " the *freeholders* and other *inhabitants*, " *housekeepers*" in the borough, were authorized to elect two fit persons to be burgesses, who were to be *freeholders*, and also to elect four suitable persons, assistants to the said burgesses; and also to elect a high constable and town clerk, who should be *residents* in the borough; provided that no person should be entitled to vote or to be elected, unless he should have been *resident* in the borough, at least one year previous to the election. Citizenship is not made a qualification either of the electors or elected; but in this, as in the other acts, the qualification of the *elected* seems to have been principally regarded; none but a *freeholder* could be elected a burgess. As *Pittsburg* increased in population and in consequence, it was found that the affairs of the borough could not be well conducted under the constitution established by the first law. Perhaps too, it was thought somewhat hard, that no one could vote for borough officers, unless he was a *freeholder* or a *housekeeper*. A petition was presented to the legislature for a new act of incorporation, in pursuance of which another act was passed on the 5th *March* 1804, 6 *St. Laws* 199; by which the first act was repealed, and considerable alterations introduced into the new incorporation. By the second section of this act " the *freeholders, housekeepers, and* OTHER IN-" HABITANTS of the said borough, who had resided therein " at least one year immediately preceding the election," and *within that time paid a borough tax*, were authorized to elect one reputable *citizen* residing therein, to be styled the

the legislature have in the most unequivocal manner, excluded these people from a privilege which justice and sound policy required they should enjoy. On the contrary, I believe that the exclusion of them is perfectly consistent with justice and good policy; and that the legislature have uniformly intended to exclude them.

Upon the whole it is conceived, that by a fair construction of the act of 5th *March* 1804, aliens are not entitled to vote at borough elections in *Pittsburg;* and if any doubts could arise on the construction of that act alone, of which however I entertain none, that the act of 7th *March* 1805, and others on the same subject, ought to be taken into view with it, as forming one system, and construed consistently.

The Court are of opinion, that judgment be rendered for the DE-FENDANTS.

1809.

STEWART
v.
FOSTER.

*burgess*, and thirteen reputable *citizens* to be a town council; also one reputable *citizen* as high constable, all of whom should be *freeholders* in the said borough; but previous to the election, the *inhabitants* were to elect three reputable *citizens* as judges, one as inspector, and two as clerks of the said election. The same superior attention to the qualification of the *elected* is here shewn, which was observable in the first law. They were all to be freeholders and *citizens*, but not so the *electors*.

It is not contended that by the *words* of this law, there is any disqualification of aliens as voters; but it is said that the law is to be construed by *equity;* that by its literal expressions *women* and *infants* might vote, and that by the principles of the common law, it is as proper to exclude an *alien*, as a woman or an infant. If there had been no reason to suppose that the case of aliens had been under the consideration of the legislature, and if it did not sufficiently appear by the words of the law, that it was *not intended* to exclude them, it would be necessary to consider the weight of this argument, derived from the principles of the *English common law.* But as the case is, I shall only say, that the argument is not so forcible here, as it would be in *England,* because *Pennsylvania,* both under the proprietary government, and since her independence, has held out encouragement to aliens, unknown to the principles of the common law. I found my opinion solely on the expressions of the act of assembly. When I find the qualifications of the electors and elected, different; when I see that none but *citizens* can be elected, but that *inhabitants* who have resided one year, and paid a borough tax within that time, may be permitted to vote, I am irresistibly led to the conclusion, that in the view of the legislature, the peace and prosperity of the borough were sufficiently secured, by providing that the officers elected should be citizens, although aliens of a certain description, who from length of residence, and payment of taxes, might be supposed to have a common interest with the other inhabitants, were indulged with the right of voting.

Thus the matter stands on the act of 5th *March* 1804. But another act, passed the 7th *March* 1805, 7 *St. Laws* 103, has been introduced by the counsel for the defendants, as throwing light upon the question. By this act,

all inhabitants of *Pittsburg* " who shall have resided within " the same, six months immediately preceding the election, " *and who shall in other respects be entitled to vote for mem-* " *bers of the general assembly,*" shall be entitled to vote at the election of officers. There is nothing in this act which repeals any part of the former act, or in any manner impairs the right of voting previously vested in any person whatever. It is an affirmative statute, extending the elective franchise to persons not embraced by the act of 5th *March* 1804; by that act none could vote who had not paid a borough tax within a year previous to the election. It is stated in the case before us, that in *April* 1804 an ordinance of the borough was passed, by which it was provided that all taxes should be levied and assessed on *real property only*. The consequence was that many persons were excluded from voting, who would have been willing to pay taxes, and who were qualified to vote for members of the legislature. These persons would naturally be discontented, and it is reasonable to suppose, that to afford relief to them, and not to take away the right of voting from any description of men who enjoyed it under the former law, was the act of 7th *March* 1805 enacted. My opinion therefore is that the judgment of the Court of Common Pleas be reversed.

YEATES J. The simple question in this case is, whether a freeman of full age, either a freeholder or inhabitant of the borough of *Pittsburg*, who has resided therein one year next before the election, and within that time has paid a borough tax, but who is not a citizen of this commonwealth, is entitled to the elective franchise at an election of borough officers, within the borough.

The solution of this question rests on the true construction of the different acts of assembly respecting the borough of *Pittsburg*. We must collect the meaning of the legislature from their own words; and the *tout ensemble* of all the laws enacted by them *in pari materia*, must be taken into consideration. The preexisting defect or mischief, and the remedy prescribed, form capital objects of inquiry.

The first act, to erect the town of *Pittsburg* in the county of *Allegheny* into a borough, was passed on the 22d *April* 1794, but the same was wholly repealed by the 15th section

1809.

STEWART
*v.*
FOSTER.

of the act of 5th *March* 1804. The second section of this act runs as follows: " The freeholders, housekeepers and other " inhabitants of said borough, who have resided within the " same at least one year immediately preceding the election, " and within that time paid a borough tax, shall have power on " the third *Saturday* in *March* next, and on the same day in " every year hereafter, to meet at the courthouse in said bo- " rough, and then and there between the hours of 12 and 6 " o'clock of the same day, elect by ballot one reputable *citizen* " residing therein, who shall be styled the burgess of said " borough, and thirteen reputable *citizens* to be a town " council, and shall also elect as aforesaid one reputable *citi- " zen* as high constable, all of whom shall be freeholders in " said borough &c."

The act " for the further regulation of the borough of " *Pittsburg*," passed 7th of *March* 1805, is an affirmative statute, and provides " that the inhabitants of the borough, " who in other respects shall be entitled to vote for members " of the general assembly, and who shall have resided with- " in the same six months .immediately preceding the elec- " tion, shall be fully competent to vote at the elections of " officers for said borough." It gives a privilege of voting, to inhabitants who have resided six months in the borough, provided they are entitled to vote for members of general assembly; but it takes away no privilege conferred by the former act of 5th *March* 1804. It is therefore obvious that the case before the court must be determined by the provisions of the law of 1804.

I fully agree, that in the construction of all statutes, it is the indispensable duty of courts of justice, to carry into execution the true intention of the lawgivers, and that in some instances, to attain this end, the words of the law have been enlarged, and in other instances, restricted. 4 *Bac.* 649. *Statute* I. 6. *Plowden* 465. In the case of a last will we are bound to search for the intent of the individual, and in a law expressive of the public will, it is incumbent on us to search for its true meaning. Where the words are clear, plain, and unambiguous, and all doubts and suspence concerning its intention are removed, we have no right to meddle with the policy of its regulations, but must conform to the provisions of the legislature. *Ita lex scripta est.*

The second section of the act of 5th *March* 1804 exhibits two distinct prominent features, in prescribing the qualifications of the *electors* and *elected.* A power to vote for borough officers, is expressly given to *freeholders, housekeepers, and other inhabitants* of the borough, who have resided therein one year next before the election, and within that time have paid a borough tax: but the burgess, thirteen town councilmen, and high constable to be elected, must not only be resident freeholders in the borough, but they must possess the superadded qualification of *citizenship.* The judges, inspector, and clerks, to be previously elected, must also be *citizens.* The two classes of electors and elected are plainly contradistinguished in this particular; and we cannot suppose, that if the character of *citizen* was deemed an essential requisite in the borough *elector,* the insertion thereof was omitted through oversight.

I freely admit that the general words conferring the privilege of suffrage, must have a reasonable construction; and that in forming the same, we can have no safer guides than the rules of the common law, as received in this state. I think therefore that females, minors, servants for years, and slaves, are not included by the generality of expression. I go further, and am strongly disposed to think, that upon principles of fair and correct construction, if these words of marked discrimination between the electors and elected had not been used by the legislature, that aliens would not have been entitled to vote at borough elections in this place.

It may be objected that we ought not to compel a sojourner to exercise the rights of a *citizen*, and perform the duties of one; and that an alien may thereby be subjected to penalties imposed on persons refusing to act as, or vote for, borough officers. But this admits of a ready answer. The alien, who is otherwise qualified, may or may not vote at the election of borough officers, at his own will and pleasure. There is no compulsion on him to exercise that privilege, and no penalties are incurred by omitting to use it. But an alien, under the terms of the law is ineligible to a borough office, and therefore no penalties can be attached to the non-performance of duties, which the law has declared him incapable of sustaining.

Upon the whole matter, I am constrained to say, that the

1809.

STEWART
v.
FOSTER.

judgment of the Court of Common Pleas should be reversed, and that judgment be entered for the plaintiff in error.

BRACKENRIDGE J. The being an inhabitant, and the paying tax, are circumstances which give an interest in the borough. The being an inhabitant, gives an interest in the police or regulations of the borough generally; the paying tax gives an interest in the appropriation of the money levied. A right, therefore, to a voice mediately or immediately in these matters, is founded in natural justice. To reject this voice, or even to restrain it unnecessarily, would be wrong. It would be as unjust as it would be impolitic. It is the wise policy of every community to collect support from all on whom it may be reasonable to impose it: and it is but reasonable that all on whom it is imposed should have a voice 'to some extent in the mode and object of the application. Reasons of policy may warrant the restraining the eligibility to office, but it must be a strong case of the *salus populi* indeed, that will warrant the restraining, much less excluding, the right of electing to office.

The act of incorporation before us, of the 5th of *March* 1804, restrains the right of electing to the being an inhabitant of the borough, and having resided within the same at least one year immediately preceding the election, and within that time paid a borough tax. Could the legislature have restrained farther without departing from a general principle of almost every corporate body? Even in the monarchical republic of *Britain*, every individual of that community is supposed to be represented, *virtually*, as they call it, and to have a voice. I do not believe that a legislature of *Pennsylvania*, would incorporate with a farther restraint of privilege, unless by oversight. I believe they have not done it. I have not examined at this time; but so far as my memory serves me, there is no incorporation of a borough, in which the being an inhabitant for a reasonable time, and the paying a borough tax, does not entitle to a voice for borough officers. Unless the legislature in this case *ipso intuitu*, looking at the thing, directly had restrained the qualification in express words, I would not say that it had done it. But has it done it by implication even? If by implication, I would require at least that it should be a necessary

implication, which nothing could resist, being contrary to all that is usual in other cases, of a like nature, and contrary to every principle of wise economy.

Does the act of the 7th *March* 1805, as is contended, restrain the privilege? It provides that the *inhabitants* of the borough, who shall have resided within the same six months immediately preceding the election, and who shall in other respects be entitled to vote for members of the general assembly, shall be fully competent to vote at the elections for officers of said borough. This so far from restraining the privilege of voting in the case of inhabitants for twelve months, who have paid a borough tax, enlarges the privilege in the case of a *citizen inhabitant* to a residence of six months, even though a tax had not been paid. Shall this courtesy, if I may so express it, this comity of the act of 1805, by implication work an abrogation in its most reasonable and salutary privilege? The construction is repugnant to every principle in the construction of statutes. The intention is manifest. The two acts are consistent and stand together: the last carrying the privilege of voting farther in the case of a *citizen*, than the former had in the case of *inhabitants* generally. As to reasons drawn from *state necessity*, to exclude all but naturalized citizens and those who have a right to vote for members of assembly, from voting at a borough election, they are observations which might be addressed to the legislature, in order to produce a modification of the borough laws throughout the state; but I take it we are not yet come to that narrowness of thinking or mistaken policy, that they would receive much attention.

The borough ordinance made after the act of 1804, that borough taxes should be levied upon real estate only, thereby excluding inhabitants not freeholders, was unjust as well as impolitic. It was *unjust*, because it excluded inhabitants who have an interest in the police of the borough, independent of the appropriation of money. It was *impolitic*, because it excluded the aid of contribution by those not freeholders, and increased the tax on real estate, or hindered the accumulation of funds to be applied to the improvement of the town. In remedy of this exclusion, and indirectly to avoid it, and secure a more liberal policy, the act of 1805 seems to have been made, and was salutary; nay it was necessary, in

order to protect the personal rights of individuals, as well as to secure the owners of real estate from the burdens of tax on real estate greater than they would otherwise be. I understand the ordinance has been repealed, but I notice it only as accounting for the law of 1805, which is the law in question.

I am therefore of opinion that the judgment of the Court of Common Pleas be reversed, and that judgment be entered for the plaintiffs in error.

Judgment reversed.