Ejectment in Error. —
The land in dispute was granted to the ancestor of the defendants. Douglas obtained a judgment against Bowman; execution issued; a part of the land thus granted was sold as the property of Bowman. Douglas became the purchaser, and obtained a sheriff's deed. Douglas sold and conveyed to Lyons; who sold and conveyed to Weatherhead, the tenant in possession. Under the general issue, Weatherhead relies on seven years' possession as a bar. *Page 353 
On the part of the defendants, it is insisted that the limitation of seven years will not be available, unless the plaintiffs can show a regular chain of paper title from the grantee to Weatherhead. This question having been frequently argued in several cases, both in the Federal and State courts, and having long had it under advisement, an opinion is formed, from which it is not probable any further argument will induce a departure. In legal phraseology, the point involved in this contest may truly be termed vexata questio. It will be considered, first, in relation to the true construction of the Act of Limitations, 1715, c. 27, §§ 1, 2, 3, and 4, independently of the decisions on that statute.
Secondly, with a view to those decisions, and
Thirdly, an exposition of the explanatory Act of Tennessee, 1797, c. 43, § 4. The first and second sections of the Act 1715, are entirely retrospective. The first section is the preamble, and contains a recital of the mischiefs. It speaks of patents from the governor of Virginia, the quit rents of which had never been paid, or the lands deserted by the first patentees, or former entries, or patents granted in the government of North Carolina.
The second section proceeds to the confirmation of claims by possession. The language employed is, "that all possessions of, or titles to any lands, tenements, or hereditaments whatever, derived from any sales made either by creditors, executors, administrators of any person deceased, or by husbands and their wives, or husbands in right of their wives, or by indorsement of patents, or otherwise, of which the pnrchaser or possessor, or any claiming under them, have continued or shall continue in possession of the same for the space of seven years, without any suit at law, be and are hereby ratified, confirmed, and declared good and legal to all intents and purposes whatever, against all and all manner of persons."
In the case of Armour v. White, 2 Hay. 69, it is said by HAYWOOD, J., "That this section of the Act of Limitations relates only to the cases of irregular conveyances made before the act passed, and confirms them, when accompanied with a seven years' possession before the act, or where the possession was then continuing, and should complete seven years after the act; but it extends to no case arising since the act." Thus it appears, not only from this opinion, but in a note annexed to the same, which afterwards occurred in page 91, that these sections are entirely retrospective; but it will be attempted to be shown, in the examination of the second proposition *Page 354 
before mentioned, that to confine the confirmation, intended by the legislature, to irregular conveyances, is too narrow for the plain words of this section as well as the whole scope of that act. In this place, however, it is not improper to remark, that the possessions confirmed go far beyond the first section or preamble; nor can the plain words of this section be restrained by the mischiefs recited in the preamble, 1 P. W. 320; Bac. Ab. tit. Statute I, 2, unless the not restraining the enacting clause by the preamble be attended with absurdity or inconvenience. 1 Atk. 174. The enacting words of this section are not doubtful, and the not restraining of them to the mischiefs referred to in the preamble would be so far from being attended with absurdity or inconvenience, that the giving the words employed their usual acceptation would be most conformable to the reason of the common law. Bac. Ab. tit. Statute I, 4 Com. dig. tit. Parliament, R. 12.
Section third of the Act of 1715 is in these words: "That no person or persons, or their heirs, which hereafter shall have any right or title to any lands, tenements, or hereditaments, shall thereunto enter or make claim, but within seven years after his, her, or their right or title, which descend or accrue; and in default thereof, such person or persons, so not entering or making default, shall be utterly excluded and disabled from any entry or claim thereafter to be made." The fourth section contains the usual saving in favor of infants, c., who are authorized within three years after disabilities shall cease, to "commence his or her suit, or make his or her entry," as might have been done before the passage of the act. Persons beyond sea allowed eight years after returning; "but that all possessions, held without suing such claim as aforesaid, shall be a perpetual bar against all and all manner of persons whatever, that the expectation of heirs may not, in a short time, leave much land unpossessed, and titles so perplexed that no man will know from whom to take or buy land."[1] *Page 355 
It is conceded by Haywood, J., in 2 Hay. 90, that these two clauses, viz., third and fourth, are prospective.
Is the plain and evident meaning of the words used in the third and fourth sections to be restrained by the preamble? To which it is answered, that it is not, unless a most palpable absurdity or inconvenience is involved, which is not the case in the present instance; see 5 Cranch, 9. Nor by parity of reasoning can the prospective clauses be restrained in their interpretation by the retrospective second section. 5 Cranch, 55.
If the legislature was competent to take broader ground in confirmation of titles in the retrospective second section than the mischiefs recited in the preamble or first section, for the same reasons it had the power to take broader ground in the prospective enactments of the third and fourth sections than either the preamble or retrospective second clause afforded.
In some cases there might be reason for this discrimination; but it will be seen, in the development of this question, that the basis on which the second section rests is more extensive than that of the third and fourth, in the single case of disabilities contemplated in the fourth section.
In the confirmatory clause there is no saving in favor of infants,c. The circumstances of these cases were under the eye of the legislature, and it was thought reasonable to make an absolute confirmation, without any saving; but this information could not exist respecting cases that had not occurred, which were contemplated in the third and fourth sections, and consequently a saving is provided for them. This accounts for the manner in which the lawgivers legislated, *Page 356 
by dividing their enactments into retrospective andprospective clauses; and it is believed this is the only difference which by any reasonable construction can be made to arise, in the view of the legislature, between its "retrospective" and "prospective" enactments.
Taking the whole of the second retrospective section together, it covers all kinds of bonâ fide possessions of granted lands. The expressions "or otherwise" put this point beyond a doubt. From these expressions, it is evident that the legislature meant to exclude a mere trespasser or squatter, claiming no title, which is frequent in new countries. All the instances previously put in the act, as "derived from sales made," c., show that the legislature meant to protect only such as should appear to be bonâ fide holders; either by legal presumption arising from seven years, possession with claim of title, agreeably to the third and fourth sections; or by positive proof of fairness in the acquisition of the land, as payment of consideration, showing a deed, c. It is believed that a mere trespasser, or person claiming no title, cannot make his possession available in communicating right, agreeably to the limitation acts of any country.
Why then, it may be asked, did the legislature undertake, in many instances in the second section, to specify the particular kinds of possession it meant to ratify and confirm? It was useless, it is alleged, if all kinds of possessions were intended. The answer is obvious. In conveying ideas either verbally or in writing, by assemblies or individuals, different modes of expression are adopted.
As it respects statutes, there is no set form. In some of the oldest statutes of England, we find no recital or relation of the mischiefs which induced the legislature to act. When the influence of the people was more felt in the legislature, preambles were adopted in order that they might be informed of the grounds on which the legislature acted. The dependence of the legislator on his constituents, in more modern times, produced another method of giving this information; and a minute specification of cases and grievances, in the form of preambles and other parts of statutes, has nearly fallen into disuse.
In the confirmatory second section, the legislature expresses all the particular kinds of cases that then occurred, and which it meant to confirm for the satisfaction of individuals thus circumstanced;[1] but as it was designed to confirm all *Page 357 bonâ fide possessions of[2] granted lands, which had been held adversely for seven years, the expressions "or otherwise," were employed, so that there might be no case without remedy. But it will be asked, why is the section confined to granted lands, as the words are not restrictive? The State is never included in any statute of limitations, unless expressly named, on the principle of the well-known maxim nullum tempus occurrit regi. Bac. Ab. tit. Prerogative, E. 5, p. 561, Gwil. Ed.
The lords proprietors of North Carolina, partaking of the King's prerogative[3] in this respect, were not bound by the limitation as it respected ungranted lands. 1 Hay. 314, 468. But if this were doubtful by the principles of the common law, a statute passed during the same session, 1715, c. 33, §§ 6 and 7, puts it out of dispute.
Returning, then, to the prospective third and fourth sections.
As it respects claimants, all statutes of limitation are founded either in the presumption of the abandonment of right, or conviction that the right is with the defendant, in which the claimant has acquiesced.
The words of these sections are plain, simple, and unambiguous. The third section adopts precisely the language used in the 21 J. I., c. 16, upon which it has been decided that the expressions "enter or make claim "imply an adverse possession. 15 Vin. Ab. 102 in N. Conformably to this idea is the opinion of Haywood, J., 2 Hay. 93.
Taking the third section alone, a writ of right, agreeably to the English law is not taken away; but taken in connection with what follows in the fourth section, it is manifest the legislature designed to take away the writ of right, and make the seven years' peaceable possession a perpetual bar against all kinds of actions. Its words are "that all possessions held without suing such claim as aforesaid, shall be a perpetual bar against all and all manner of persons whatsoever, that the expectation of heirs may not in a short time leave much land unpossessed, and titles so perplexed that no man will know from whom to take or buy lands." *Page 358 
Considering the two prospective sections together, the following provisions are evident: —
1st. As against adverse bonâ fide possessions for seven years, every claimant is perpetually barred from recovery; and consequently the possessor will have a complete right.
2d. That an entry, or continual claim, agreeably to the principles of the common law, will not save the bar.
3d. That no color or appearance of paper title on the part of the possessor is necessary to make the bar of the statute available; bare possession of granted lands with claim of title is sufficient.
The first proposition has long since been at rest; in fact it was never doubted until the opinion of Judge Moore, in Armour v.
White, 2 Hay. 88.
Obviously as the second and third propositions seem deducible from the plain words of the third and fourth sections, it has been held otherwise by weighty authorities. As the difficulties in which we are now involved, and the mists of doubt enveloping the subject, seem to have been produced by an improper construction of this statute by men eminently distinguished for legal science, it occurs as being important to trace these errors to their source. The reasoning adopted to prove these propositions unsound are to be found in a note to the case of Armour v. White, 2 Hay. 88; Tayl. 321.
In the whole course of judicial proceedings in every country, nothing seems to have excited more sensation than the limitation of actions. The cause of this excitement, so unfavorable to a correct exposition of such statutes, is easily discernible. The peace, good order, and happiness of mankind render it indispensably necessary that those who wish to seek redress for injuries should do it within some reasonable time. The legislature is obliged to prescribe some uniform rule, as a limitation of time. Owing to the negligence of some, and the indulgent disposition of others, the statute very often intervenes against just demands; so felt by those who are seeking redress, and often perceived by the courts. Thus, courts are frequently led imperceptibly into a train of reasoning for the attainment of justice, without sufficiently regarding the policy of the law. Hence arise constructions which will not bear the examination of cool and abstract reasoning. The reasoning employed in the note to the case of Armour v. White will be minutely examined, by dividing it into ten distinct propositions.
First Proposition. — "There could not have been, then (`prior to 1715') any certain known mode of conveyance by which one *Page 359 
individual could convey lands to another." 2 Hay. 89.
It will not be denied that the common-law mode of conveyance by feoffment was in force. Though actual delivery of the land was the usual mode, yet any act on the land, by which it could be understood that the owner meant to dispose of it, was sufficient where possession followed such alienation. Com. Dig. tit. Feoffment. It is admitted there was no uniform mode of conveyance, as the second section evidently demonstrates. But it was not necessary there should have been any evidence on record of alienations by feoffment, as the argument supposes. In the illiterate state of the country, when North Carolina was first peopled, feoffments by simple livery of seisin must necessarily have been in use. The lords proprietors could not have been divested of their title without grant; 1715, c. 33, § 6. Hence, mere possession of ungranted land gave no title. After grant, individuals stood in the same relation to each other, respecting such lands, that they would have been in England; and there it is well understood that naked possession with claim of title was evidence of right, and, after the statutory prescription had attached, that evidence was conclusive against every claimant. At the time of the passage of the act, though the statute of limitations 21 J. I., c. 16, was not in force in North Carolina, the 32 H. VIII., c. 2, was, which required sixty years' possession to bar adverse claims.[1]
 Second Proposition. — "Under such circumstances the country must necessarily have been in a state of great inquietude. There existed two great evils demanding the interposition of the legislature: first, the want of a certain established mode of conveyance, and secondly, a confirmation of the titles thus irregularly obtained." Ib.
A third, and far more important reason than either of those mentioned, is omitted, to wit, that the existing limitation of sixty years was much too long for the acquirement of that peace, happiness, and strength, so desirable in every country, but particularly in a new one, which was continually exposed to the incursions of the savages.[2] It was, *Page 360 
however, desirable that a uniform mode of conveyance should be established, and that, too, by deed in writing, in exclusion of all others. Feoffment, being frequently a transaction in pais, was not calculated to afford information of the real owners of land in a new and unsettled country, as North Carolina at that day was. A knowledge of the alienations of unoccupied lands could be acquired in no other way than by deed registered. Hence the fifth section of c. 38 of the same session, by which it is provided that there shall be no conveyance of real property except by deed registered.
In relation to those who had obtained claims under the circumstances disclosed in the second section, it will be recollected the country had not been settled long enough to give a complete right by possession under the statute of H. VIII. No doubt can exist that the persons for whose benefit the second section was passed, or those under whom they claimed, were not settled in North Carolina as early as the year 1655; if not, the statute of H. VIII. could not protect their possessions.
The first charter to the colony of North Carolina was not granted until the year 1675. There was inquietude, no doubt, and the situation of the country loudly called for legislative interposition in favor of a hardy, meritorious, and continually exposed race of first settlers. The inherent difficulties attendant on the settlement of a new and wilderness country were sufficiently distressing, without adding to the burden an almost indefinite exposure to lawsuits for the recovery of land which they had improved at great risk and hazard.
In this respect, precisely the same reasons must have operated with the legislature as to the prospective provisions contained in the third and fourth sections.
Third Proposition. — "The legislature could not mean to ratify and confirm in future such illegal conveyances as were contemplated in the second section." — p. 90.
One of the reasons adduced, and apparently that which has the greatest force, is contained in this observation: "For in order to prevent the like inconveniences and inquietudes for the future, they, at this session, declared how lands shall be conveyed; and moreover, that no conveyance shall be good, unless acknowledged or proved and registered."
It is asked, "Did they suppose, notwithstanding the act pointing out and ascertaining the legal method of conveyance, that the irregular ones mentioned in the second clause would still be used?" *Page 361 
Conformably to the habits and practice of mankind, the legislature might well suppose, when passing the third and fourth sections of the act of limitations, that many cases of this kind would occur after the passage of the law requiring conveyances to be by deed.[1] It certainly knew that though a deed was necessary to constitute a conveyance, that that deed might be lost by accident or neglect during the lapse of years. Different objects were in view, and there is no inconsistency in supposing the legislature meant to provide, by the statute of limitations, for cases which might happen, consistent with the habits of mankind, after as well as before the act.
Nothing is. or ever has been, more frequent, than for those who purchase to do it without counsel learned in the law. The idea of tracing a title to its origin, or the grant, is almost peculiar to professional men.
Most frequently laymen purchased on the responsibility of the seller; and notwithstanding the act requiring a deed of conveyance, their incompetency to know who is possessed of clear right to sell, or of the requisites to constitute a valid conveyance, must always remain in a considerable degree.
Would there be any thing unreasonable in a disposition in the legislature to protect the honest and ignorant improver who might be uninformed respecting the validity of a conveyance? Such a supposition would be inconsistent with the opinion delivered by Haywood and Stone, judges, in the case of Grant v. Winborne, 2 Hay. 57, where it is said that "it was the intent of the act, that where a man settled upon and improved lands, upon supposition that they were his own, and continued in the occupation for seven years, he should not be subject to be turned out of possession." Surely it will not be contended that many honest farmers, ignorant of the formalities of law, might still acquire lands in some of the irregular ways contemplated in the second section, "and settle upon and improve them upon supposition that they were their own." The same principle is admitted in the case under review, p. 96. If so, according to this opinion, the third and fourth sections would protect them; the words of the act are broad enough to cover all sorts of possessions with claim of title of granted lands. This point *Page 362 
however having been much doubted, was at length settled otherwise. 2 Hay. 336. Some further observations will occur in their proper place.
Fourth Proposition. — "The second bars with color of title, when it is insisted by those who oppose the argument that the third and fourth bar without such color, which would be inconsistent and absurd." — p. 91.
As before observed, it is manifest from the expressions "or otherwise" in the second section, that the legislature meant to protect all adverse bond fide possessions of granted lands with claim of title, whether there were color of paper title or not; but if it did not, it is repeated that it would be an incorrect construction of the third and fourth sections to restrain the plain import of the words without some cogent reasons for it. None such is believed to have existed. A construction which does not require color of paper title in either case approaches nearest to the reason of the common law, and therefore should be adopted, if there were doubt from the words of the statute.
Fifth Proposition. — In relation to the second section, it is admitted to be retrospective; "and with regard to it, as relating to cases after the act, it is erroneous to say color of title with seven years' possession will give a right in fee to the possessor; for though a color of title does, as I contend, really have that operation, it is not by reason of any thing contained in the second clause, but arises from the true construction of the third and fourth clauses." — p. 92.
Upon inspection of the third and fourth sections, no expressions can be found which warrant the idea that the legislature intended to require color of paper title in the possessor. It is admitted it cannot be found in the second section, and consequently it is to be found nowhere. But,
Sixth Proposition. — To establish the proposition that the possession, when the statute applies, operated as a perpetual bar, it is said: "Every instance, either in the preamble or body of the act, evinces an intention to settle disputes between claimants under opposite deeds or grants for the same land, and proves that the person to be protected by the provision of the act was one who had an appearance or color of title by a subsequent deed or grant as well as the person to be barred." — p. 92.
Here recourse is had to the preamble and second section for instances or description of cases particularly circumstanced which the legislature meant to protect, when it seems to be admitted in the fifth proposition that color of title arises not from those sections, but the third and fourth. It is *Page 363 
presumable what is meant by the body of the act is the prospective third and fourth clauses. In them no idea can be collected that color of title is necessary; and to restrain their meaning by the particular instances given in the preamble and second section, would in this case evidently oppose the known and well established rules of construction.[1]
 Seventh Proposition. — "The remarks already made upon the causes of passing the act, show it was made to settle disputes between claimants under different grants for the same land, and this is the reason why it never extended to the lords proprietors, as it would have done (they being equally subjects with the settlers of the country) had it reached the case of disputes arising upon possessions, unaccompanied with deeds or grants, or naked possession." — p. 95.
The only prominent point in this proposition is, that if we suppose the act did not design color of paper title, on the part of the possessors in all cases, the lords proprietors, who were the representatives of the crown, would be barred or ousted of their rights by naked possession without grant. The observations previously made are a sufficient answer to this part of the case, and show clearly that it was not by force of any words in this statute their rights were saved, but a general principle of law, as well as by the express provision contained in the sixth section of the Act of 1715, c. 33. This is further demonstrated by an adjudged case in North Carolina, 1 Hay. 468, where it is said, after reciting verbatim the act under consideration, "that the right or title to be barred by a neglect to enter within seven years is a right or title which by the common law may be preserved by entry, — a jus possessionis derived under some grant of appropriation, — a right totally different from the jus pre-emptionis created by the entry laws."
Eighth Proposition. — "In the times preceding the act, none pretended to hold lands by possession against a deed or grant, nor was it conceived that possession could either make or bar a title. How could it, when no law existed for that purpose? The 21st J. I. c. 16, was not in force, nor indeed any statute made after the fourth year of his reign in the year *Page 364 
1607, that being the era of the settlement of the country legally authorized and continued. For want of such a property inherent in possession naturally, the act was passed to give it that property in certain instances and under certain restrictions." — pp. 95, 96.
No account of the judicial proceedings of North Carolina, previous to 1715 has reached the present generation; though the country had not been so long settled as to enable possessors to avail themselves of the provisions of the statute of Henry VIII. for the limitation of actions, yet it surely must then have been conceived, if people would think at all, that after a sufficient lapse of time, agreeably to that statute, possession alone of granted lands without color of title would both make and bar a title. Adjudged cases unquestionably ascertain this point.
It is true, as before remarked, that the statute of 21 James I. c. 16, was not in force, but the 31 Henry VIII. c. 2, was.
The last part of the proposition, that the want of a natural, inherent property in possession to confer right was the reason the statute required color of title, seems difficult to analyze. If, for the idea of what is naturally inherent, we recur to the writers on the law of nature and to Blackstone, we shall learn that the occupier and improver of the soil, independently of municipal regulations, is entitled to hold possession to the exclusion of others. The statute of Henry VIII. agrees with this principle.
By that statute, as well as the 21 James I. c. 16, color or appearance of paper title is not required to give a right to the possessor. So that, by any known law in existence at the time of the Act of 1715, this color of title was not required.[1]
 Ninth Proposition. — "The claiming of lands by a naked possession against a title by a deed or grant, which claim, whenever made, is grounded on the act; and this mistaken idea has encouraged those having no title, colorable or otherwise, to settle upon the lands of others and commit trespasses with a view of acquiring a title by a continuation of such trespass for seven years together." — p. 96.
This is the argument, ab inconvenienti, and agreeably to *Page 365 
the maxims of our fathers is fortissimo in lege. That part of the proposition which supposes a naked possession of ungranted lands is not a bar is admitted.
Our first inquiry will be, whether there was such a peculiarity in the state of society in North Carolina, at the time of the passage of the Act of 1715, as called for the adoption of a new principle, in relation to limitation, as that in relation to mere trespassers claiming no title whose possessions would not be covered by limitation or otherwise.
In the English law which was in force, no such idea as color of paper title can be found.
The country was a wilderness, and as usual in such a state in different parts of the colonies, the first and most important object was to encourage emigration and settlement. The first settlers were generally illiterate; many of whom settled on and occupied lands without purchase, but in expectation of obtaining a pre-emption right in consequence of occupancy, and afterwards complete their titles by purchase from the crown or lords proprietors. It is difficult to conceive that many individuals, after the passage of the act, settled upon patented lands, with a view of obtaining a title by seven years' adverse possession or claiming as their own.[1] There were wandering families who settled at any spring they could find, but seldom with a view to permanent settlement, claiming the lands by metes and bounds, unless they had previously purchased from some person.
It is understood that the first appropriations of lands in North Carolina, after the passage of the act, were generally for settlement; consequently, it is presumable that the owners or their agents were generally citizens of the country. Can it be thought that there were many persons who were so wild in their notions of property as to settle upon, mark out boundaries, and make improvements on lands with the remote probability that the owners would acquiesce in the continuance of these trespasses for seven years and thereby lose their lands? Rare, indeed, so long as man retains his nature, must be such instances.
Laws which have an extensive operation are bottomed on the idea of what is most frequent among men.[2] In the infant state of a country, when the people were much *Page 366 
exposed to savages, it is hardly possible to suppose that the legislature was governed by a fear of such trespasses. As it was the policy of the government to encourage population, it is more than probable that it meant to establish such a rule as would be most extensively beneficial by freeing adventurers who had settled the country from the embarrassment of law suits. This disposition is shown by fixing the short time of seven years' possession and making it a perpetual bar.[1]
At once we perceive, as between claimants and possessors, who were the greatest favorites with the legislature. In plain language, claimants are told it is indispensable we should get our country settled; population must be encouraged; our disposition is to sell to those only who will settle, clear, and cultivate the lands, so as to give the country strength and safety, and as far as we can, consistently with sound policy, to protect such persons in the fruit of their toils, difficulties, and dangers. Though there may be a few individuals who have or may hereafter settle on granted lands without having purchased of any person, and have or may continue there for seven years, yet as we know from the nature of things that these cases must be rare, it is not important to legislate on so narrow a principle, especially as such persons will have incurred expense, and for a considerable time will be exposed to hardships and dangers, the owners or claimants being negligent during the whole time in not asserting their claims,[2] and, in most cases, not living among us to give that aid and comfort to society which its situation requires. If persons have good and valid paper titles, they do not stand in need of our protection. It is the numerous body of illiterate men who have honestly paid for their lands, but who through ignorance of forms have not legal paper titles, or, when taken, have, or may through time and accident, have lost them. We know that negligent claimants will be greatly more numerous than dishonest possessors; we will make a plain and simple rule, capable of being understood by every person, knowing that simplicity and inflexibility of rule in limitation is all important to its preservation. To those who assisted in the first settlement of the country, we give an absolute title free from the possibility of any future *Page 367 
embarrassment; and therefore in relation to them, there shall be no saving as to infants, c.[3]
Those who shall hereafter acquire possessions, claiming the property as their own, and partaking of the security already acquired by the first settlers, shall be protected after seven years' peaceable possession, but subject to the demands of those who may be under disabilities to sue. This is the only exception made against them, for we are sensible of the sensation that will be excited in opposing a demand by the statute of limitations; that every possible construction will be sought after by claimants to come at defendants, and thus doubts and difficulties are apt to arise, let the rule be ever 30 plain and simple. To make an exception in favor of negligent claimants against a few trespassers, would be adding to the difficulties naturally growing out of such a case; but considering the negligence of claimants, or their acquiescence when improvements were making, as more reprehensible than settlements on lands by indigent individuals, who are not able to procure them, the exception could only be claimed as a matter of indulgence, and we are not disposed to give it. See the arguments of Davie in the case of Strudwick v. Shaw, 1 Hay. 5; Youngv. Irwin, 2 Hay. 12.
During the same session, c. 33, § 1, the legislature uses this language: "Whereas of late years great inconveniences have arisen by means of the irregular proceedings and method observed in taking up lands, and by some persons holding or pretending right to large tracts of land, to the great discouragement of strangers coming in to inhabit among us, and to the great weakening of places already settled and inhabited, as well as to the great loss and prejudice of the lords proprietors; for prevention," c., section fourth provides "that no person shall take up more than 640 acres in one tract, nor two several tracts nearer than two miles of each other." *Page 368 
 Tenth Proposition. — "From the foregoing remarks, admitting them to be just, it is to be collected that the second section of the act of limitations, regards irregular, invalid, and informal couveyances, made before the act passed; that the third and fourth sections relate to cases where several persons have deeds or grants, perfect enough in form, for the same tract of land; and some of those persons, under deeds or grants of a posterior date, take and continue the possession for a considerable length of time; and that the true meaning of the latter clauses are to confirm for ever the title of all such persons having a color of title, who may continue in possession under such title for seven years without entry or suit in law." — p. 97.
This is the conclusion of the argument which is controverted. As the second section has had its effect, nothing further will be said on that ground.
In relation to the third and fourth sections, the subject seems susceptible of other illustrations in confirmation of the principle assumed, that by those sections color of title[1] was not required of the possessors of lands. The first occurrence of the idea of color of title is in the argument of Davie, in the case of Bakerv. Webb, 1 Hay. 60, in the year 1794, which is grounded on the idea that the second section had a prospective operation, a position now admitted to be untenable. The decision of the Court, however, turned on other points, and nothing was said on this. In the case of Strudwickv. Shaw, 1 Hay. 5 (1791), the statute of limitations came directly before the Court, and color of title was not insisted on, though Mr. Moore, a man of abilities, and who was afterwards one of the judges of the Supreme Court of the United States, was of counsel for the plaintiff. Judgment was given for the defendant by "Williams and Macay. *Page 369 
The first judicial opinion in North Carolina, requiring color of title on the part of the defendant in ejectment, was given by the author of the argument under consideration, and will be found in the case of Young v. Irwin, 2 Hay. 9 (1797). In that case Mr. Haywood sat alone. The question again occurred in the case of Grant v.
Winborne, 2 Hay. 56, when Stone, J., concurred in the opinion. In Armourv. White, 2 Hay. 87 (1799), Moore was on the bench with Haywood, and dissented, which produced the note annexed to that opinion now under review, and which also has been published in Taylor, 321.
Williams and Macay were men of age and experience, and were the first judges after the Revolution; consequently it is believed they well understood the construction put on this statute whilst North Carolina was a colony. It is known to almost every person that Judge Williams was long a practitioner of the law under the colonial government. So was Judge Johnson, who was eminent in his profession. In the great case of Wells and Newbold, Taylor, 166, argued before him in 1802, by Gaston for the defendant and Haywood for the plaintiff, it was decided "that as neither entry nor claim had been made within seven years, and as the person then entitled to make such entry or bring such suit did not come within any of the exception, of the statute of limitations, the lessor of the plaintiff could not disturb the possession of the defendant."
The long possession of Lee and those claiming under him is, in the words of the statute, "a perpetual bar against all and all manner of persona whatsover." All these judges have concurred in opinion, that color of title by the Act of 1715 was not required. Such is believed to be the uniform current of opinion, under the colonial government; nor was there ever a doubt on the subject, until about the year 1795. In the same year (1802) Judge Johnson, in Bloss's case, 2 Hay. 356, says "seven years' possession without color of title will bar the plaintiff's right."
To this case there is a query, stating it had since been decided in the Court of Conference in North Carolina, that the opinion was not law, meaning the case of Stanly v. Turner, 2 Hay. 336, decided, in the year 1804.
It is not denied that this question was ultimately decided in North Carolina in Stanly's case, but, as it is conceived, incorrectly. Contemporaneous construction is certainly opposed to this decision. In this view of the subject, it is not improper to take into consideration an act of the legislature *Page 370 
of North Carolina, 1748, c. 4, § 5; Ird. 122. Its expressions are, "whereas several persons have been many years in quiet possession, and have by fire or otherwise lost their patents, grants, or mesne conveyances of their lands," it is provided "that all persons who had been in quiet possession for the space of twenty years next before the ratification of the act, and shall make proof thereof before the governor and council, general court, or court of the county where the land lies, and shall enter such proof in the auditor's office, or the office of Earl Granville, in case the land shall be within his territory, or district, that then and from thenceforth such persons, their heirs and assigns, shall quietly hold and enjoy such tract or tracts of land, against his majesty, his heirs and successors; he or they paying quit rents," c.
Here we find the legislature had under its eye the loss of title papers, both grants and mesne conveyances. Provision is made for the one, but not the other. Now, if the legislature believed the loss of mesne conveyances was not already provided for by the statute of limitations, would it not have provided for such cases also? It is impossible to think otherwise; as such cases must necessarily have been vastly more numerous, and equally requiring redress.
It is said in this proposition, "that the third and fourth sections relate to cases where several persons have deeds or grants perfectenough inform for the same tract of land." From these expressions the present embarrassed situation of the principal question arises; for it seems to be pretty clearly implied in them that a regular chain of title from the grant down to the possessor was thought necessary; yet it can scarcely be believed that it was the understanding of the author of the note or argument under consideration.[1] For we find in the same case of Armour v. White, when it first occurred, 2 Hay. 69, and when Haywood sat alone *Page 371 
he uses this language: "The act that gives effect to possessions which are taken and kept, with a reasonable ground of belief that the lands so possessed do belong to the possessors, as from some deed or the like, from some person having a pretended title." Again, in the argument of Wells and Newbold, he puts this case: "A. having no right might convey to B. and give him a color of title." Taylor, 195, 196.
Thus we are able to conceive what would constitute color of title in the opinion of the author, and that the expressions employed in the conclusion of the note in the case of Armour v. White are not to be understood as requiring a connected chain of title.
From the most perfect view I am able to take of the third and fourth sections of the act, the following inferences seem evidently deducible.
1st. That the statute cannot operate, unless the lands have been granted.
2d. That color of paper title was not required by that statute.
3d. That the possession contemplated operated a perpetual bar.
The first and third seem to have created no difficulty in North Carolina; it was the second which seems to have been much agitated, and attended with great doubt and embarrassment, both on the bench and at the bar in that State, from the year 1797 until 1804, when it was finally settled there in Stanly's case, 2 Hay. 336.
In the case of Kerr and Porter at Nashville, November, 1796, Tenn. 15, 353, the provisions of this act were discussed at great length for the first time in this country. I was of counsel in that case, and well recollect the public excitement occasioned by it. In that case Porter had been in possession seven years, claiming under an entry or location a part of the time before he procured his grant.
On the part of the defendant, it was insisted that, by the Act of 1715, naked possession was sufficient. At this time, it was known that in North Carolina doubts had been raised respecting that statute, but what they were was not ascertained. The Court, in Kerr and Porter, did not give any decisive opinion on any part of the statute. Much public discussion took place, when every thing was involved in doubt.
In this state of things, the legislature of Tennessee, at its first session in the year 1797, took up the subject; and it is worthy of remark, that a member of the legislature that *Page 372 
year, from the neighborhood of the sitting of the Superior Court, where the case of Kerr and Porter was discussed, was the principal mover of the bill which finally passed into a law. What seemed to excite the attention of the public at that time was, that, agreeably to the doctrine contended for in the case of Kerr and Porter, the possession of any trespasser on the lands of the State or an individual might acquire a title by seven years' continuance, a doctrine which was thought to be iniquitous and unjust. It was to remedy this evil, the legislature was moved to pass the Act of 1797. There were other doubts growing out of the Act of 1715 at that time, but not considered of much importance. When passing the act, however, the legislature undertook to remove them.
The Act of 1797 is in these words: "And whereas doubts have arisen with respect to the true construction of the present existing laws respecting seven years' peaceable possession. Be it enacted,
that in all cases where any person or persons shall have had seven years' peaceable possession of any land, by virtue of a grant, or deed of conveyance founded upon a grant, and no legal claim by suit in law, by such set up to said land within the above said term, that then, and in that case, the person or persons so holding possession as aforesaid shall be entitled to hold possession, in preference to all other claimants, such quantity of land as shall be specified in his, her, or their said grant, deed of conveyance, founded on a grant as aforesaid: And any person or persons who shall neglect for the said term of seven years, from the time of such peaceable possession having been obtained, to avail themselves of any title, or legal claim, which he, she, or they have to any lands within this State, shall and is hereby declared to be for ever barred," with a proviso in favor of minors, c.
To obtain a correct view of this statute, the antecedent circumstances have been detailed; and though the doubts which existed at the time of the passage of this act, in relation to the Act of 1715, have since been removed by the decisions of the courts of North Carolina, the legislature of Tennessee had no other guide than the statute itself, and the doubts which had been raised in this country.
A statute which is plain and unambiguous leaves no room for construction or variety of opinion, but the statute of 1797 is admitted by all not to be such. The rules of interpretation must, therefore, be applied.
 Four distinct objects seem to have been in view by the legislature. *Page 373 
1st. To give a description of all such possessions as the statute of limitations intended to cover.
2d. To declare what kind of claim was intended to be set up, to save the bar of the statute.
3d. To designate the quantity of land the statute of 1715 intended to protect by the possession. And,
4th. To declare the effect of that possession.
The preamble to the act shows that the legislature intended the statute to be entirely declaratory. There are established rules, by which we are to operate in finding out the intention of the legislature.
We should adhere to the words and grammatical propriety of sentences, unless an obvious and general inconvenience is the consequence. The principal difficulty arises from the obscurity of the language used in relation to the first point. On the part of the plaintiffs, it is urged that the expressions "deed of conveyance founded on a grant" necessarily convey the idea that there must be a connection between the deed and the grant, by a regular chain of paper title. This is surely a construction which the words will bear; but it does not seem to be necessarily exclusive of all others. Construe the act as it may, it is manifest it was drawn very inaccurately, and with but little regard to grammatical propriety in the structure of the sentences. Mala grammatica nonvitiat, is a maxim of the law. To be confined to mere grammatical propriety of words and syllables, in opposition to the obvious intention of the legislature, collected from the words of the same act, or different acts on the same subject, would subvert the first principles of legal science.
Lawyers look in all doubtful cases for the intention of the legislature in the circumstances in which it was placed and reason of the case. The intention, say the authorities, is to be collected from a consideration of the old law, the mischief, and the remedy, and not from the conjugation of verbs or declension of nouns. In this way we should soon be nonplussed in the act before us; for the relative pronoun such has no antecedent, unless it be the wordpersons in the fourth line before it, and that is impossible, as it would make the tenant in possession the plaintiff in ejectment, which would be absurd. It would be found equally inconvenient to make the participle founded refer to the substantiveconveyance. But as this is the hinge upon which the whole difficulty hangs, we must recur to the ordinary rules of construction, which are:
That statutes passed on the same subject shall be viewed in partmateria. *Page 374 
That we must know the mischief intended to be remedied.
Give such a construction as will advance the remedy and suppress the mischief.
That a construction shall be avoided which will produce manifest absurdity or inconvenience; and in order to attain this end, general words may be restrained or enlarged in their meaning, transposed, or supplied.
The books are replete with authorities in support of these positions but particularly 19 Vin. Ab. 520, pl. 6, 7, 8; 2 Day, 97; 1 Dall. 434; 2 Binn. 119; 3 Binn. 348, 357; 1 Mumf. 201, 210; N. C. L. R. 86; Hughes, 150; 2 Call. 466, 467; 1 Dall. 463; Penn. 216; Hughes, 158; 3 Cranch, 67.
It has been insisted that statutes of explanation must be construed strictly, without any departure from the letter.
Roane, J., in 2 Call. 459, says, "that the ancient doctrine was, that the Court on such a statute was tied down to the letter. But the better opinion seems to be, that such statutes may now receive even an equitable construction arising therefrom, on a general view of the whole statute." Agreeably to the first rule of construction, the statute of 1715, must be taken into consideration in fixing the meaning of this. The direct and primary object in both acts was to designate such possessions as should be a bar, and not the manner in which paper titles should be deraigned; in the latter, the intention evidently was to exclude such possessions as were founded in the idea of disseisin or intentional wrong.
The idea of intermediate titles between the grant and the deed of the possessor is not necessarily inferrible from the design or scope of either statute, nor from the words. Supposing the first act to possess the meaning settled in Stanly's case, 2 Hay. 336, which is the utmost that ever was contended for, such intermediate connection between the deed of the possessor and the original grant never entered the head of any judge or lawyer in North Carolina. Nor is there any reason to believe that it was in contemplation of the legislature, when passing the Act of 1797.
In the Act of 1715, the legislature speaks of possessions derived from, c. The legislature certainly must have meant the same thing in the use of the expression founded, in the Act of 1797. All the doubt that existed as to this part of the case, when the Act of 1797 passed, was whether some evidence should not be required of the possessor to show *Page 375 
that he was not a wrong-doer, or mere trespasser. It was this evidence which the legislature meant to require, and not that he should deraign a regular paper title; otherwise the legislature would have exceeded the limits of mere explanation, and have made a provision new in its nature and principle: of which neither the circumstances which produced the act nor a fair construction of its words afford a reasonable presumption.
These acts were intended to fit the circumstances of the great body of laymen of whom the country is composed, and not with a view that its principles would be applied principally to conveyancers, or persons learned in the law. Common men rely on the land having been granted, of which perhaps long possession is sufficient evidence with them; and upon the warranty or responsibility of the seller. The idea that it is necessary to trace up the title, link by link, for fifty or a hundred years back, scarcely ever enters their heads. Nor would it in process of time be reasonable to require such labor and expense, as it would in most cases be fruitless. All that is required in England, or that reasonably can be required anywhere, for safety to purchasers, is, to see there is such a possession as the statute of limitations requires. Sugd. 205, 239.
According to the doctrine contended for by the defendants, if a single link of the chain of paper title (though a century or more elapsed) be lost, the improver and possessor must lose his land too, should there be an adverse claim; and it is well known there is enough of them and ever will be, whilst any person may procure a grant by paying a small consideration to the State, as ever has, and probably ever will be, the case. As the Statute of 1715 was understood by most of the best informed men in this country, at the time of the passage of the Act of 1797, no paper title whatever was required of the possessor; it is true, many doubted, as in North Carolina, whether the act did not require him to show a deed, so as to exclude the idea of trespass, but no one thought of this regular chain of paper title until of late years, and long since the passage of the Act of 1797. Can it be possible the legislature, instead of explaining the Act of 1715, as it professed to do, should have covertly designed to repeal it? or in other words to make such an amendment as nearly to do so, by reducing the extensive compass of its operation to a single dot or case, out of perhaps a thousand or more covered by it.
"We should in a little time nearly relapse into the state in which the Act of 1715 found the country, "that no man *Page 376 
could know of whom to take or buy lands;" and so far from quieting men's estates, and avoiding suits in law, it would furnish aliment for a new race of land jobbers; one that would be essentially opposed to the policy and reason of the common law. Explorers of other men's titles for years, perhaps ages back, for the purpose of discovering some flaw or chasm in the chain of paper title, so as to take advantage of it, by entering the land and getting a grant for it, bring an ejectment, compel the possessor to exhibit his paper title, and if a single link should be wanting, he must fall to the wall, and the land hunter take it.
Such a construction as this put on such a statute, which has been expounded liberally, and considered as the harbinger of peace and quiet and not as the demon of discord, is too big with mischief and inconvenience to be adopted.[1] It would be foreign to the subject-matter; so far from advancing the remedy and suppressing the mischief the legislature had in view, it would be in opposition to the one and a fruitful mother of the other.
It is the first principle in the construction of statutes, that an adherence to the letter must be abandoned, if by such adherence the leading or primary objects of the legislature are to be defeated. Unquestionably the object of the Act of 1797 was to strengthen
and not to weaken the security, arising from seven years' possession by an honest and bond fide holder. This is clearly evinced by the act requiring suit instead of entry, which by some was supposed sufficient to save the bar by the Act of 1715; by declaring that the possession[2] should operate to give a title to all the lands within the lines of the tract, instead of such land only as should have been actually enclosed, as had been contended for; and finally, by declaring that such possession should be a perpetual bar, instead of its being a bar to an ejectment and not to a writ of right. *Page 377 
All these points were involved in doubt when the Act of 1797 was passed; leading characters were divided on them, as well as on the point whether color of title were requisite by the Act of 1715. There is no doubt in my mind, that the legislature of 1797 correctly understood the genuine meaning of the Act of 1715, in relation to the three first points; but if the question were res integra, I should not think a like construction had been put on the act by the legislature on the last point.
Why require a chain of title, regularly deduced from a younger grantee? It would be as much a defective title as if a link in the chain were broken; it is no better or more meritorious than if such a link were wanting. In common sense, where is the difference between a link of the defective title being lost and being there, but operating nothing; the chain being too weak to bear the tug of judicial conflict? Suppose a case. The grant from the State is the foundation or commencement of the chain; the first and last deeds or mesne conveyances, the first and last links in the chain. Can it possibly make any difference whether this first link were produced or not, provided the land was granted to some person? The position that a chain of title is necessary, defeats itself when traced to its source. Thus the State grants a tract of land to A., who conveys to B., who conveys to C, afterwards A. conveys to D., who takes possession and holds for seven years. It is impossible in this case that D. can deraign a regular chain of title, because at the time A. conveyed to him he had no title to convey.
We cannot suppose the legislature did not intend to protect a person in this situation. In fine, the argument of the defendants on this ground amounts to this, that out of the vast number of cases of seven years' possession of granted lands, variously situated, and which equally require the protecting aid of the statute, but one single case is selected as being worthy of the fostering care of the legislature of 1797; to wit, where there are two grants for the same piece of land, an older and a younger one, under which the plaintiff and defendant respectively claim by a regular and connected chain of title, — a construction utterly repugnant to and nearly subversive of the main object of the legislature, which was to secure peace and quiet to thebond fide seven years' possessor of granted land.
In the construction contended for on the part of the defendants, the good sense and policy of the common law in favoring possessions (1 New. 64, 233) would be lost *Page 378 
sight of; the settlement and improvement of a wilderness country discouraged; almost all security in land titles after the lapse of a few years would vanish; and agriculture, the foundation of all society, droop and decay.
These are inconveniences which any construction should avoid if possible. In 6 Bac. Ab. 382, two rules are given; first, "if any thing contained in a subsequent statute be within the reason of a former statute, it shall be taken to be within the meaning of that statute. And a statute containing another, with some additional clause, must be considered as if the former had been recited therein." This rule equally applies in the construction of explanatory statutes, partmateria, and, if so, the relative pronoun such, in the Act of 1797, may find its antecedent in the third and fourth clauses of the Act of 1715, and nowhere else; it will then read thus: such persons as shall have any right, title, or claim set up, c. As the act explained was before the eye of the legislature when the explanatory act was drawn, we must supply these expressions from the former act, having been, in presumption of law, casually omitted. To give the sentence a sensible meaning, it must he done, and the rules of construction warrant it. Though the balance of the section may read intelligibly and grammatically without supplying other words from the original act, yet, consistent with the evident meaning of the legislature to be collected from both acts, as well as the doubts to be removed, we are constrained to introduce the great and leading object of the legislature,possession, between the substantive conveyance and participle founded. Its not having been done was manifestly an inadvertent omission, or it is probable in a supposition of the drawer that the idea of possession would be understood elliptically, or repeated from the use of the conjunction or.
If we give the literal construction to this part of the act which is contended for by the defendants' counsel, the statute of limitations will be so restrained in its operation as to be inconsistent with any rational rule of construction, and open a flood of inconveniences, the consequences of which cannot be easily foreseen.
As in the Act 1715, § 2, it was the intention of the legislature, in its description of such. possessions as should afford a bar, to advert to the derivation or foundation of suchpossessions, so it was in the Act of 1797, and not to paper titles, as the argument on the part of the defendants supposes.[1] *Page 379 
There remains a test, if further argument were wanting, by which the meaning of the legislature of 1797 can clearly be ascertained. The legislature uses this language, "that in all cases where any person or persons shall have had seven years' peaceable possession of any land, by virtue of a grant, or deed of conveyance[2] founded upon a grant."
This sentence supposes two distinct classes of claims. First, by virtue of the original grant and possession; second, where the claim is by virtue of a grant, deed, and possession. The word founded
was only designed by the legislature to show that there must be afoundation for the bar of the statute in the second class of cases as well as in the first.[1] *Page 380 
Having had frequent occasion to examine, consider, and attentively weigh every word in the Act of 1715, my own opinion of its meaning in relation to color of title remains the same that it did twenty years ago; but as men eminent in their profession, in North Carolina, have thought otherwise, and particularly the legislature of this State in its explanatory act thought so too, the subject is no longer resIntegra, and as a rule of judicial conduct I am bound to consider the Act of 1715 as requiring that color; the legislature of my country says such was its meaning, and officially I cannot depart from such interpretation in all cases arising since the Act of 1797.
It will bear that interpretation when taken in connection with the fifth section of chapter 38 of the same session, as stated in the case of Hampton v. M'Ginnis, 1 Tenn. 286; but taking it in connection with any law, before or after, common or statute, it never can be construed to require that the possessor should exhibit a regular chain of paper title from the State to himself before his possession can be available under the statute.[2] To require it would subvert all grounds of analogy to the principle of the common law, and clearly contravene the express object of the legislature, which was "to quiet men's estate so that they might know of whom to take or buy lands," and approach very near an entire repeal of a statute, which has been of the first importance to the peace and happiness of the people or country; and that too without the least previous intimation of such design. Such a supposition is derogatory to the character of any legislature or principle of construction.[1]
Should it ever in any case appear that the deed under *Page 381 
which the possessor may claim be covinous, or executed and received with an intention of affording nothing more than a color of title, a question, different from any growing out of this record, will be presented, and upon which no opinion is given.
The opinion offered will be received with due deference to the opinions of others from which it may happen to differ, but it is the only satisfactory one that can be formed.
Judgment must be entered for the plaintiffs in error.
[1] The act of limitations of the State of South Carolina in its prospective clause, passed in the year 1712, is in these words: "That any person or persona to whom any title to lands shall descend or come, who do not prosecute such right to the same within five years after such right or title accrued, all such persons, and all persons claiming under them, shall be for ever barred from recovering the same," with the usual saving. It has a retrospective, confirmatory clause, of the same import with the first and second sections of our act. See Bay, 1st and 2d vol. The statute of limitations of the State of Georgia, passed in the year 1767, is in these words: "That all writs of formedon in descender, remainder, and reverter, of any lands, c., or any other writ, suit, or action whatsoever, hereafter to be sued or brought by occasion or means of any title heretofore accrued, happened, or fallen, or which may hereafter descend, happen, or fall, shall be sued or taken within seven years next after the passing of this act, or after the title or cause of action shall or may descend or accrue to the same, and at no time after the said seven years. And that no person or persons that now hath or have any right or title of entry unto any lands, c., shall at any time hereafter make any entry but within seven years next after the passing of this act, or after his or their right or title shall or may descend or accrue to the same; and in default thereof, such persons, so not entering, and their heirs, shall be utterly excluded from such entry after to be made," c.
In the construction of both these acts, possession required by them without color of paper title is a perpetual bar.
[1] Vide 1 Co. 24, acc.; 5 Cranch, 55; Pr. Johnson,J.
[2] The words of the second retrospective section are, "possessions of, or titles." The whole of the reasoning of Hay. in the note to Armourv. White, goes on the idea of titles alone, excluding the idea of possession.
[3] Vide contra, 1 Har. McH. 151, which seems to be the better opinion, though different from that to be found in 2 Har. McH. 138.
[1] Such was the law in Pennsylania previous to 1785, when twenty years' possession was made a perpetual bar. See Dall. Binn. So in Maryland, 3 Har. McH. Seven years' possession is a perpetual bar in Georgia; and fifteen years' like possession a similar bar in Connecticut.
[2] 2 Bay, 160, acc.
[1] In most of the States of the Union, it is believed conveyances of real property are required to be by deed; and yet adverse possession, without color of paper title, is a bar.
[1] As well as the admission contained in the 5th proposition. It is this error in taking the main ground of argument from the words of the retrospective second section, which diffuses its influence over the entire scope of the note under review. Besides, in the whole of the argument the expressions possession of (to which or otherwise, in the same sentence, relates) seem to be entirely overlooked.
[1] No such principle is believed to have been required by the civil law, common law, or municipal regulations of any country, or State in the Union, except in the single instance of the statute of 1797, passed by Tennessee.
[1] Claiming as their own, by metes and bounds of lands, c., to be understood as synonymous with adverse possession. 9 Johns. 58, 59, 179, 180, acc.
[2] Qua frequentius accidunt.
[1] 2 Bay, 160, acc.
[2] Vigilantibus non dormientibus servit lex.
[3] South Carolina did the same thing by the passage of their act of limitations, in the year 1712, and in that act there areretrospective and prospective clauses, precisely similar to the statute of 1715, passed by North Carolina, an adjoining State, under the same circumstances only three years after that passed by South Carolina. In South Carolina, adverse possession alone for five years is a perpetual bar. No possible reason can be seen why the construction of these two statutes should be different. See 1 Bay, 376; 2 Bay, 160, 329, 343. Requiring title, or color of title, is. incompatible with the only principle on which all limitation rests, namely, to furnish of itself evidence of the title from adverse possession and claim of property.
[1] Color of title. By these expressions the author of this opinion is to be understood as meaning that, in all cases under the Act of 1715, naked peaceable possession, with a claim ofproperty for seven years, carries with it a presumption that the possessor came in rightfully, and not by wrong. The possession for seven years, accompanied with claim of title, in the estimation of the author, agreeably to the Act of 1715, was not only a color of title, but a complete one; and consequently, the defendant could not be required to show color when he had a valid and complete title. No other alteration seems to have been produced by the Act of Tennessee 1797, c. 43, § 4, than to re. move the presumption of right from the possessor, and throw the onus probandi on him requiring the production of a deed of conveyance, will, c., or some legal paper writing, thereby showing that he was not a tort feasor.
[1] This argument was written in the heat of controversy, no doubt, and it would seem to be fair to understand the whole scope of it in reference to its main object; viz., that a mere trespasser or squatter, claiming no right, should not be permitted to protect himself by seven years' possession, — a position which is, in itself, correct. It is not the mere possession that gives right in limitation, but, in relation to lands, must be accompanied by claim of property in fee simple to the extent of certain metes and bounds, thereby affording notice in pais. This claim of property is believed to be necessary, agreeably to the laws of every country, so as to enable the possessor to avail himself of limitation as respects land.
[1] 4 Day, 309; 4 Mass. 188; 2 Bay, 160; 1 Binn. 212; 2 Inst. 112, 25; Plow. Com. 3 b.; Co. Lit. 381 b.; 360 a.; 3 Co. 7 b.; 2 Inst. 518; 8 Mod. 7; Dyer, 131; pl. 70; Hob. 346; Carter 136.
[2] It is worthy of remark that the legislature employs the expressionpossession, as it respects the defendant, and nottitle or titles, as in the Act of 1715, from which last expressions so much difficulty has arisen; and which must have been inserted in the second section of the Act of 1715 either from abundant caution, or for the satisfaction of the people, and not from any necessity, which is frequently done in legislative acts.
[1] Even the retrospective second section uses the expressions "possessions of, or titles," to which "or otherwise," in the same sentence, relates; thus making the whole weight of the argument bear on "possessions of;" for, if possessions will do as well as titles, there is no necessity to rely on any but possession with claim of title under the Act of 1715.
[2] Deed of conveyance. This must be considered as an instance, put by the legislature, expressive of its sense, that it should be shown that the possessor was in possession, if not by deed, yet rightfully, and not as a trespasser or intruder. See 19 Vin. Ab. 515-520, particularly in p. 518, pl. 69, 70, where it is said "particular statutes shall not go beyond the words, but general statutes, which are for the benefit of the commonwealth, shall be construed largely and by equity. It is not unusual for acts of parliament, especially in the more ancient ones, to comprehend by construction a generality where express mention is made of a particular, this particular being taken as instances of all that want redress in the kind whereof the provision is made," for which a great number of authorities are cited; quando sunt verba specialia, ratioautem generalis, statutem generaliter est intelligendum, Vin. Ab. Limitation, 105, in point.
[1] In 1 Cranch, 102, the Supreme Court of the United States, in construing a statute, uses this language, "Some latitude of construction, then, must be used, some words additional to those used by the legislature must be understood; and this being apparent, the Court perceive no sufficient motive for extending the remedy to rights existing when the survey shall be made, and denying it to those which are equally valid, and which exists when the caveat may be entered." See also 3 Cranch, 66, 67, c.
Washington, J., in the case of Fisher v. Blight, 2 Cranch, 399, gives the true rule of construction in these words: "When a law is plain and unambiguous, whether it be expressed in general or limited terms, the legislature should be intended to mean what they have plainly expressed, and consequently no room is left for construction. But if from a view of the whole law, or from other laws in panmateria, the evident intention is different from the literal import of the terms employed to express it in a particular part of the law, that intention should prevail, for that in fact is the will of the legislature." See Wil. Ed. Bac. Ab. tit. Statute I, n. Brackenridge's Law Miscellanies, 326.
[2] This is entirely a different question from privity of lawful possession for seven years being shown. That would seem to be requisite. See 10 Johns. 477, acc.; 3 Day, 258, contra.
[1] Limitation is founded principally in the idea that after a lapse of years men ought not to be required to produce any paper evidence of title, on the supposition that in time such evidence may be lost, destroyed, or beyond the reach of the most diligent research. We know instances have occurred of the loss of registers' books; deeds of conveyance, of course, will disappear. 2 Hay. 78, 79. Time or the lapse of years, agreeably to the construction contended for, so far from bringing with it security, operates directly the reverse; and the longer a person and his forefathers have been in possession, the more insecure the claim or right to his land.
Statutes of limitation are those of repose and quiet, in which the law delights, and which are always literally construed, to attain the ends proposed. Tenn. 188; 2 Bay, 160; 1 Binn. 213.