## SMITH AND ARMISTEAD, APPELLANTS, vs. BRYAN CROOM, ET AL., APPELLEES.

An appeal in Equity from a *final* decree, is substantially a re-hearing of the cause, and the appeal opens the whole case. This Court will, therefore, examine questions which may have passed, *sub silentio,* at the hearing before the Chancellor, if raised by the pleadings and proofs. The case of the So. Life Ins. and Trust Co. vs. Cole (4 Fla. R. 359), referred to and approved.

This Court will always gladly avail itself of the light which may be afforded by the reasoning of the Court below, but when it comes to decide, it has to do only with the *conclusions,* as they are embodied in the judgment or decree—the logic of the Judge is beyond its control.

An issue to the country is usually at the suggestion of the Chancellor himself, and is designed to aid him in arriving at a satisfactory conclusion as to a particular fact—it is not a matter of right.

Upon an application for a re-hearing of a cause decided by this Court, it is irregular, and an infraction of the rule of the Court, to accompany the petition with a *written argument,* and the citation of authorities.

The Appellee, by his counsel, W. G. M. Davis, presents hereby a petition that a re-hearing be had of this cause.

The petitioner asks for a re-hearing on the following grounds:

*First.* That the evidence of the witnesses by whom the fact of the survivorship was sought to be proven, was too contradictory to be relied on in so grave a case, and that the contradictions were such as could only be reconciled

upon the idea that the witnesses spoke of a person whom they assumed to have been Mr. Croom, as they place the man testified about in places and under circumstances wholly different and impossible. Schroder and Quinn speak of his being swept off by the first wave. Hussey and Bishop speak of him at a later period. Bishop and Quinn speak of him with his son, and without females. Schroder and Hussey saw him with ladies. Quinn proves the death of the father and all the family, but one, at the first stage, leaving the daughter alive. Schroder, Hussey, and Bishop, say they saw the father, son, and two ladies, but not the daughter. Quinn, by whose testimony the survivorship of Henrietta is to be proven, contradicts Bishop, Hussey and Schroder, as he swears that the family, all but the daughter, perished by the first breaker. Quinn swears the daughter was with him on the wheel-house. Yet Mrs. Schroder and Vanderzee, who were specially interrogated as to that, say they were close to the wheel-house, and did not see the daughter—that if she had been there, they must have seen her.

Bishop says he saw and knew Quinn. Bishop was near the wheel-house, yet he says he did not see the daughter. So Quinn is contradicted by the witnesses of the complainants. How is it possible to decide an important right on such evidence? No jury would find a verdict upon it. Is this Court to disregard the palpable contradiction, and to do what no lawyer could prevail on twelve men, not lawyers, to do?

In view of the conflict of testimony, I humbly submit that the proper course to pursue, as the Court was disposed to differ with the Circuit Judge, is to send the question of survivorship to be tried by a jury of the country, to whom matters of fact should be submitted, and by whom they can be better determined when the witnesses who testify disagree in their statements. If this was a case at law,

involving the title to a horse or a cow, my client would have a jury of his fellow-citizens to go before; here he is to be stripped of his estate, and reduced to almost total penury, without having the benefit, so dear to every American citizen, of a trial by jury. I submit, then, that the cause should have been remanded, and an issue directed. Our law particularly leans to jury trials, and seeks to exclude all questions of fact from coming before the judiciary. This policy is evidenced by the statute which forbids a Judge to charge upon matters of fact, save in writing— thus sedulously guarding the province of the jury.

The English Chancellors have, when the evidence was doubtful and conflicting, preferred to send the question of fact to a jury. The books are full of such cases. Judge King did not deem it necessary to decide upon the question of survivorship, so far as the son, Wm. Henry, was concerned. He decided that Henrietta Mary did not survive.

If the Judge below did not decide the fact raised in the bill and answer, whether Wm. Henry did or did not survive, then this Court had no right to decide on appeal, because as that fact remains undecided in the Court below, this Court cannot determine it. If it does, it determines the question as an original one. The survivorship of the boy and girl is a material question, and only necessary to be decided in case the domicil is established not to be in Florida. The Court below decided Florida was the domicil, and thereupon refused to decide whether Wm. Henry and Henrietta Mary survived the father—just as this Court refuses to decide one of the questions as to the statute of distributions because what had been decided rendered it unneccessary. This is of daily occurrence in our Courts, and when a Judge in the Court below decides a point which is conclusive of the controversy, the Judge stops there and does not go on to give his opinion upon a branch of the case

Smith and Armistead vs. Croom et al.—Petition for Re-hearing.

no longer essential to his judgment.   If an appeal is taken from what the Judge has decided, and his judgment is reversed, what is the course?   Why the cause is sent back, and he proceeds to determine that which he had not before decided, taking the decision of the Appellate Court as a part of his own judgment.   When he decides the second point, the whole case has been determined in the court of original jurisdiction.

This Court is a Court of Appeal.   It can revise and reverse what an inferior court has decided, but it has no other power.   It cannot reverse where there has been no decision.   This Court has ordered the Court below to review its decision.   It has reversed what Judge King decided—but it cannot be said to reverse what he did not decide.— He gave no judgment and pronounced no opinion on one of the (now) important points of the case.   Can this Court undertake to give its judgment on appeal upon that point? If it does, and there was no judgment or determination of the point in the Court below, then the judgment which is given by this Court is original and not appellate.   That it is original is manifest, for a judicial determination is now given of a matter of fact, essential to the cause, which has never been *decided* by any Judge before.   I maintain, therefore, that the Court for this reason should reconsider their judgment.

The counsel for the Appellee submits to the Court the following reasons why the decision of the Court as to the question of domicil should be re-argued :

The question is a novel one to us all—bench and bar. It is important.   To my client it involves his all.   He is a man well off, or a beggar in his old age, as it may be decided.   We are all human, and liable to error ; and in deciding a novel question, there is the more ground for error. It is particularly so in this question, admitted by all courts and all writers to be one of great difficulty.   There can no

evil arise from greater thought, and greater study of the authorities than the Judges have been able to give to them. The object of the Court is to do justice, and I feel convinced that could they be shown that they had erred in their judgment, they would bless the opportunity that was offered them to escape from the pain and suffering they would feel should they thereafter ascertain that they had by error wrought out the run of a fellow citizen. Pride of opinion is strong in the human breast, but it is what no Judge who esteems himself will indulge, and I feel persuaded that, although the opinion in this case has been put forth, the ears of the Judges are still open to hear reason. I well remember an expression of one of the Judges, uttered in respect to the consideration of a case by the Judges singly, that he should hold himself ready, up to the last moment, to recall his judgment if he should find cause to change his views.

I do not pretend to seek to change the opinion of the Court by any argument original with myself. I rely not at all on my opinions or my views. I should not offer them unsupported. I can only point the Court to decisions of eminent Judges which I think will serve to change the views they have expressed after they had heard argument in which the great eloquence and skillful conduct of the concluding counsel had caused the feeble efforts put forth in behalf of my client to be cast into the shade, and an impression created which time and study of all the authorities are requisite and necessary before the Court can rest satisfied with their [task. I can but supply industry and research, and point out where the law is to be found, which I hope may incline the Court so far to doubt as to allow a re-hearing. I cannot hope to make an argument that will have any intrinsic weight. We all look to the books for our knowledge. It is by the books the Court announces itself to be governed. I rely for a re-hearing on the view which

I take of the law of citizenship, as it is known in America and is found in American decisions. This citizenship I understand as equivalent to domicil, when applied to an American born or a foreigner naturalized. To be a citizen of a State, says Judge Story, a man must have his domicil in the State.

If a man has his domicil in a State, to which he has removed from another State, he is a citizen of the former.

In Case vs. Clark, 5 Mason C. C. Rep. 70, Story, J., says : " It appears to me clear that there is no sufficient proof that the plaintiff is a *citizen* of Massachusetts. To effect that purpose, it should be established that there was a *bona fide* change of *domicil;*" there must be a *bona fide* intention of removal, and a real change of domicil.

In the same case he shows that a removal for business or pleasure, a sojourn, does not make a citizen. This was a question of forensic character—a question as to the right to sue in the Federal Court ; and in this case, as in all the others where the question has come before the Federal Courts, the question of the right to sue as a citizen of a State has been put upon the question of whether the person was or was not domiciled in the State for all purposes, and the rules as to domicil laid down in the same way as in succession cases, and the cases as to succession referred to.

In Story's Commentaries on the Constitution, Vol. 3, pp. 564, 565, in treating of that clause of the Constitution which gives jurisdiction to the Federal Court between *citizens* of *one State* and *citizens* of *another State*, he explains the meaning of the word " citizen " as there used. He says : " Are all persons born within a State to be always deemed citizens of that State, notwithstanding any change of domicil, or does their citizenship change with their change of domicil ? The answer to this enquiry is equally plain and satisfactory. The Constitution having declar-

24

ed that *citizens of each State* shall be entitled to all privileges and immunities of *citizens in the several States*, every person who is a citizen of *one State* and removes *into another*, with the *intention* of taking up his *residence* and *inhabitancy* there, becomes *ipso facto* a *citizen* of the *State where he resides*, and he then *ceases to be a citizen of the State from which he has removed his residence*. In general it may be said that a removal from one State into another, *animo manendi*, or with a design of becoming an *inhabitant*, constitutes *a change* of *domicil*, and of course a *change of citizenship*."

Here we have emphatically declared, that as to the right to sue in the Federal Court, " domicil " and " citizenship" are synonymous. We see that any decision made in the Federal Court whereby the right of a party to sue in that Court as a *citizen* of that State, *requires* the Court to decide whether he has his " domicil," as defined by Story as above quoted, in the State, and that a change of domicil is a change of the former, so far as the Federal tribunals are concerned.

The difference between a change of domicil from one State to another and that removal to a foreign country for business or pleasure, is strongly put : " Residence in a foreign country has no operation upon his character as a citizen, although for purposes of trade it may impress him with the character of the country."

The views here expressed by Judge Story are confirmed by legal decisions in the Federal Courts, by Judges Paine, Washington, C. J. Marshall, Judge Woodbury, and Story himself. Catlett vs. Ins. Co., 1 Paine C. C. R., 594 ; Case vs. Clark, 5 Mason C. C. R., 70 ; Cooper, Lessee, vs. Galbraith, 3 Wash. C. C. R., 546 ; Lessee, Butler, vs. Fannsworth, do. do. 101 ; Brock. Rep.; Burnham vs. Rangely, 1 Wood. & M., 7.

In all these cases we find the Court holding that the

right to sue as a citizen depends on the question whether the party had his domicil, inhabitancy, legal home, permanent abode in the State of which he claimed to sue as a citizen, and whether ¡he had fully and entirely abandoned his *former domicil*, and, per consequence, *ceased to be a citizen of his former State.*

With these authorities before us, so respectable, it cannot be that what an English author, or an English Court may have said as to there being two domicils, " one for succession in one *place*, and one *forensic* in another *place*," can have the effect to influence this Court.

The remark quoted from Phillimore at page 20, is based upon a case decided in England in 1844.

The decisions of the English Courts as to the consequences which result from a change of residence by a citizen of one of our States to another, or as to any act done in the latter State, which is relied on as an *indicia* of domicil, certainly cannot prevail over the decisions of our own country.　We all know the frequent errors which English statesmen, judges and lawyers, fall into when treating of American institutions.

The doctrine of domicil is not as well understood in England as in America, and we find their Court so declaring.　As late as 1845, in a case in the House of Lords, Lord Campbell said : "The truth is, my Lords, that the doctrine of domicil has *sprung up very lately* in this country, and that neither the Legislature nor the Judges thought much of it."

Having, as I think, settled by American authority, that citizenship in a State, and domicil for all purposes, are synonymous, I submit that any act which would be deemed conclusive to show that a man was a citizen of a State, would show him *domiciled* in the State.

I further submit that no man can have two domicils or citizenships in different States.　Story says, " every person

who is a citizen of one State, and removes into another, with the intention of taking up his residence and inhabitancy there, becomes *ipso facto*, *a citizen of the State where he resides.*" And then he states as a necessary consequence, that which I contend for, that "*he ceases to be a citizen of the State from which he has removed his residence.*"

Here, then, we find that to be a citizen of a State, is to be domiciled in it.

To become a citizen of a State is to cease to be a citizen of the former State of residence and domicil.

That which will prove a man a citizen of a State, proves his domicil in the State, because to be a citizen he must be domiciled.

We then enquire, what proof there was that Hardy B. Croom was a citizen of Florida in 1833 and 1834? What is the proof on which the Courts of the United States would have so determined?

What is the highest evidence of citizenship? I answer, the fact of the exercise of the rights and privileges of a citizen. He who is entitled to the exercise of the rights of a citizen, owes the duty of a citizen. If a man exercises the right properly and lawfully, he must necessarily be a citizen. The fact that a man enjoys the rights of a citizen, in the absence of any proof of fraud or error, shows that he intends that which is the legal consequence of his act, viz: to become a citizen, and perform ·the duties belonging to that character. This is an inevitable result. A man cannot serve two sovereigns; he cannot be a citizen of two States, and when he gets himself admitted to act as a citizen of one State, he cannot say he is a citizen of another.

I quote the opinion of C. J. Shaw in the case of Abingdon vs. Bridgewater, 23 Pickering, 178. "The supposition that a man can have two domicils, would lead to the absurdest consequences. If he had two domicils within the

limits of distant sovereign States, in case of war, what would be an imperative act of duty to one, would make him a traitor to the other." He goes on to give other illustrations, and says : " The propositions that every person must have some domicil, and can have *but one* at the same time, are rather to be regarded as *postulata* than as propositions to be proved."

Having established, not by my own reasoning, but by that of the greatest Judges who ever held office in America, that citizenship, in a forensic point of view, as in every other, is equivalent to domicil, and includes all and every element of domicil, I now proceed to establish, by the authority of the greatest statesmen and lawyers, living and dead, that have adorned the pages of our jurisprudence by their arguments, that *voting* is the most conclusive test of citizenship in a State of this Union *that can be adduced.*

I do not assert this; I do not offer any argument of *mine* to establish it. I do more, vastly more. I prove what I contend for by the evidence of men whom this Court has ever recognised as competent to teach us what is the law of America.

The first authority I quote is that of Hon. George E. Badger, formerly counsel for appellants in this cause, a shining light amid the eminent jurists of America. In his speech on the "Kansas Bill," page 1307, appendix of Globe, vol. 28, part 2, he says:

"The Senator from Indiana says, that *citizenship* and *suffrage* are not the same thing. Undoubtedly, but *citizenship* is the *status* which is pre-supposed to exist in every man before he is capable of receiving the right of suffrage. That was the notion of our forefathers. It was a discovery of modern times, that a man may be a member of a political community, so far as to exercise the powers of the ballot box, to vote for legislators, to elect all the officers of the

community, and yet that he should not have a citizenship in the country he thus aids in governing."

In the case cited from 6 Howard S. C. Rep., Judge McLean says, voting is conclusive evidence of domicil; not of forensic domicil, as those terms are understood in France and Holland, where there is a forensic domicil in one part of the kingdom, and a political in another, and one for succession (all three in the kingdom, however,) in a third. But the Supreme Court were deciding the citizenship of the defendant in the case. To decide this, as we have seen, they had to determine his domicil—they had to decide, as Story and the other Judges had said was essential to the decision, whether he had gone to Louisiana, *animo manendi*, had abandoded his domicil in Virginia, and had ceased to be a citizen of that State. This is what Story says, page 565, vol. 3, Commentaries on the Constitution. The Supreme Court, then, in the case in 6th Howard, being called on to determine these questions, say, "that voting is conclusive"—conclusive of what? Of the fact that the man had designed to assume the rights of a citizen in Louisiana, and as a consequence, conclusive as to the intention with which he had gone into the State.

So say the Supreme Court of the United States, by a full and unanimous Court, composed as it was of its greatest names. They declare the exercise of the right of suffrage to be the putting on of the garb of a citizen, which is the assumption of a domicil, and involves an abandonment of a former citizenship, and an abandonment of a former domicil. Voting, then, in the opinion of the Supreme Court of the United States, is not a small matter and entitled to but little weight in deciding upon citizenship and domicil.

What authority is opposed to that of this able Court? *First.* A *dictum* of an English Advocate, in the English Courts; a man who could know but little of American in-

stitutions. *Second.* The opinion of an English Ecclesiastical Court, made a long time ago, when the subject of domicil was so imperfectly understood, that one of the most eminent Judges of the Court, Sir John Mitchel, in Stanly vs. Bemes, denied that the goods of an Englishman, domiciled in Portugal, were to be distributed by the law of his domicil. The case of DeBonnéval vs. DeBonneval, however, is not an authority here, because DeBonneval did not have his own name registered in England, and the Court decided the case on the strong ground that the man was a Frenchman, a political exile, designing to return to France whenever the political events would allow; that a change of dynasty occurred, and he returned and resumed his titles and estates. These grounds were so conclusive that the views expressed as to political rights, taxes, etc., were mere *obiter dicta.*

In the case of Guier vs. O'Daniel, the Court do not say that voting is a matter of no consequence. There was no vote cast, and it was argued that the fact that he did not vote, was evidence that the party did not claim a domicil. The Court reply by saying that a man can have a domicil although he does not vote. A man may refuse to vote, as many do.

But when they speak of his offer to vote, they do say that the offer to vote is evidence of intention as to domicil. (See the remarks of the Court where they speak of the offer of the ballot, its refusal, and the intention evinced by such offer.)

There is no case to be found in America where voting has not been deemed important, as deciding a question of domicil. We find cases where men were indicted for voting, and the one in 8 Alabama Rep. decides the party's guilt on the ground that he was not domiciled in Alabama.

. The case of Guier vs. O'Daniel, cited by Phillimore to sustain his views as to voting—(see Phill. p. 89)—does not

support him. The Court say a man can have a domicil and not vote—can gain a domicil before he is entitled to vote. No doubt of this. The Court mean this, when they say voting is not essential to create domicil. We do not say it is, but that citizenship and domicil precede the right to vote. The Court in Guier vs. O'Daniel, (Phill. p. 152,) say: "Guier was present at one election and offered his ticket, which, though not received, is a *striking fact* to show he *considered himself in the light of a citizen.*"

The ticket not being received, does not alter the nature of the transaction on the part of Guier. The evidence resulting from it of intention to settle is the same as if it had been actually received.

"Evidence resulting from it of intention to settle," are the words. What is meant by them? Why, that he "considered himself a citizen," and wished to be so considered.

I desire on this subject to refer the Court to the debate in the Senate on the admission of Michigan, and the speeches of Calhoun, Clay and others, and in 1854 to the debate on the Kansas Bill, and the speeches of Bayard and Clayton of Delaware, Badger of North Carolina, Benjamin of Louisiana, and others, in all of which it is declared that citizenship is necessary to suffrage.

As to that part of the opinion which rejects the declarations and written documents in the hand-writing of Mr. Croom, I refer the Court to the case of Kosciusko's Will, reported in 14 Howard S. C. Rep., 400, where the Court say that the description of Kosciusko in his will is highly important evidence as to domicil, and cite the cases in England and America to support them. If the decision of this Court is entitled to more weight than the *dictum* of Mr. Phillimore, then the written deeds in which Croom styles himself of Florida are of that weight as evidence which the Supreme Court in North Carolina, and Judge Woodbury in 1 Wood. & M., p. 7, attaches to them.

Want of time prevents me from going into a more full argument. I close by a reliance on the desire of the Court to be sure they are right, and not to maintain their opinion as essential to their own feelings. I know that an appeal to a Court to change its decision is oftentimes unsuccessful; but I know that the Judge who overcomes that reluctance natural to the human mind to surrender its views, accomplishes a triumph over the feeble nature of man, and performs a work worthy of a great mind. To admit that we have been wrong is an effort, but he who makes it is sure of receiving the approval of his own conscience and of his fellow men.

All of which is respectfully submitted.

DuPONT, J., delivered the opinion of the Court.

This is an application on the part of the appellees for a re-hearing of the above stated cause, which was decided at the present term. The petition sets forth two grounds as the prominent basis of the application : *First*, that the Court erred in deciding upon the survivorship of William Henry, the son of Hardy B. Croom, for the reason that that point had not been passed upon by the Chancellor who pronounced the decree, and for the further reason that the conflict of evidence upon the fact, made it a case peculiarly appropriate for the decision of a jury. *Secondly*, that the Court erred in deciding that the domicil of succession of H. B. Croom was in North Carolina at the date of his decease; and that error is accounted for upon the hypothesis, that in the consideration of that point by the Court, the act of voting by Mr. Croom, in Florida, in the year 1833, did not receive its proper weight, and that too much stress was placed upon the fact that his family continued to reside at the domicil of origin in North Carolina.

With respect to the first point, we are fully satisfied that it was not only within our province, but that it became our

25

imperative duty to decide upon the question of survivorship. The position assumed in the petition is, that the Supreme Court, as an appellate tribunal, is prohibited by the very nature of its organic functions from determining any question which may not have been passed upon in the Court below, and that to do so would be to convert it into a Court of original jurisdiction. This position may be perfectly sound when applied to an appeal from an interlocutory decree, which does not conclude the merits of the case, but it is clearly not applicable to an appeal from a final decree. The decree appealed from in this case was, that the bill be dismissed. Conceding the position to be well taken, then how, and by what means, is the Court to ascertain whether or not the Chancellor did pass upon the question of the son's survivorship? The only legitimate source of information that we can resort to, to ascertain the action of the Chancellor, is the decree itself, which constitutes a part of the record. That decree is in the following words, viz; "This cause having been heard in February, 1856, and held under advisement, until the Court being advised of its judgment and decree to be rendered therein ; and it appearing to the Court that the complainants have failed to sustain the allegations of their bill, and are not entitled to the decree prayed for therein ; it is therefore ordered and decreed that the said bill be dismissed, and that the complainants pay the costs of the suit." Will it, in the face of this decree, be seriously contended that the question of the survivorship of the son was not determined by the Court below? Was it not a most material "allegation" in the plaintiff's bill, and the one upon which her right (as his administratrix) to the possession of the personal property in controversy, mainly depended? Here was a suit between the administratrix of the son, and the administrator of the father—the question of survivorship as between the two, was the controlling

question in the case, so far as the right to the possession of the personal property, in their respective representative characters, was concerned. If the father survived, the possession belonged to the administrator; but if the son survived, then his administratrix was entitled to the possession, no matter whether the domicil were determined in Florida or in North Carolina. Some suggestion was made at the hearing of the original case, that if the domicil should be determined to be in Florida, the Court ought not to disturb the possession of the defendants, even though it should be decided the son survived the father, inasmuch as the defendants, in that state of case, would be the only parties entitled to the distribution of the estate. A full answer to this view of the matter is, that distributees of personal property are permitted to enforce their claims only through an administration duly granted upon the estate of the decedent, and that by the recorded consent of the defendants, the complainant was permitted to amend her original bill, by styling herself as the administratrix of the son, and thus her representative character, and the rights and incidents attaching thereto, were fully recognised by the defendants themselves.

We will not feign an ignorance of the source whence the counsel who framed the petition for this application derived the information that the question of the survivorship of the son had passed *sub silentio* before the Chancellor. That information, we presume, was furnished by the printed opinion of the Chancellor, which was politely handed to the members of the Court during the progress of the cause, and the perusal of which they did not debar themselves from any false notions of propriety. But it will be distinctly recollected that the Court refused to permit the same to be read, for the avowed reason that it constituted no part of the record upon which they were called to decide. This Court will always gladly avail itself of the light which may be

furnished by the reasoning of the Court below, but when it comes to decide, it has to do only with the conclusions as they are embodied in the judgment or decree—the logic of the Judge is beyond its control.

But the question as to the province of this Court to consider all questions made by the pleadings, has been authoritatively settled by a former adjudication, and we need do no more than briefly to refer to the case. In the Southern Life Insurance and Trust Co. vs. Cole, 4 Florida Rep., 359, Justice Thompson, in a very able review of the cases on this subject, sums up in the following language: "From a careful review of the authorities, we are satisfied that an appeal in equity is substantially a re-hearing of the cause, and that the appeal opens the whole case to the respondent in the Appellate Court; and although the appellant may show that the view taken by the Court below was erroneous, yet on the other hand the respondent may argue, and show if he can, that upon the whole case the same result must be attained here. The authority of this Court, by sec. 5th of the act of Feb. 10, 1832, (Thomp. Dig., 449,) is ' to reverse or affirm the judgment, sentence or decree of the Court below, or to give such judgment, sentence or decree as the Court ought to have given.' It is very clear that the power to give the decree which the Court below ought to have pronounced, could never be exercised if this Court did not possess the right to look into the whole case, as it is presented in the record, and to con-sider it as the Court below should have considered it. We are therefore satisfied that we have the right to look into the whole cause, as it is presented in the record—to re-examine questions decided against the respondent, and also such as passed *sub silentio* in the Court below; or to consider points made here for the first time, provided they are made by the pleadings and proofs, but adopting, however, for the protection of the parties, the guards laid down

by C. J. Spencer, in the case before cited, that neither party will be permitted to surprise or mislead his adversary, or to make objections which might have been obviated had they been presented for the consideration of the Court below."

With regard to the suggestion that the conflict of evidence upon the question of survivorship, makes it a point peculiarly appropriate for an issue to the country, we have only to remark, that if the conflict were such as it is represented to be, the suggestion would have been much more appropriately made in the Court below than here, where the consequence would be a still further delay of rights which have already been in litigation near twenty years. But this Court does not feel the pressure of the conflict of the evidence to the extent suggested, for our conclusion upon this point is the result of a moral conviction, which leaves no reasonable doubt upon the mind. An issue out of chancery is usually at the suggestion of the Chancellor himself, and is intended to aid him in arriving at a satisfactory conclusion as to a particular fact; it is not a matter of right.

With regard to the second ground of error assigned in the petition, viz : that in the consideration of the question of domicil, too little weight was given to the exercise by Mr. Croom of the political right of voting, and too much of the fact of the continued occupancy by his family of his original family mansion. We have only to remark that we have maturely considered the point, by an anxious and deliberate review of our reasoning on the subject, and a thorough re-examination of the authorities relied on ; and we find no cause to suspect the correctness of our original conclusion. In treating of these acts in the original opinion, they are viewed merely as *criteria* of intention, more or less controlling, according to the attendant circumstances. The error into which the counsel have fallen in the

argument on this point, we conceive to be, that instead of weighing the various acts and declarations of Mr. Croom, as a matter of evidence, to determine his intention, they would make the isolated act of voting over-ride every other indication, and therefore conclusive. We do not think that any of the authorities, when properly interpreted, give any support to this view.

We deem it proper to remark, in conclusion, that the mode observed in presenting this application to the Court, has been in some measure a departure from the obvious requirement of the rule upon this subject. That rule prescribes that " Re-hearings must be applied for by petition in writing within fifteen days after the judgment or decree, setting forth the cause or causes for which the judgment or decree is supposed to be erroneous. The Court will consider the petition *without argument*, and if a re-hearing is granted, direct it as to one or more points, as the case may require." The application in this case has been presented in the form of an elaborately *written argument*, and not by simple petition, as is directed in the rule. We mention this merely for the purpose of maintaining the correct practice under the rule, and with no design to impute an intentional impropriety to the counsel who makes the application. The soundness of this interpretation of the rule is too obvious to need any argument in its support, for it will readily occur to every practitioner that if it be important to one party to have his cause re-heard, it is equally important to the other that there should be an end to the litigation. The case of Lines vs. Darden, (6 Fla. Rep. 37,) forms no exception to this view of the practice. In that case the petition had been filed at a former term, but was not then heard. It afterwards came before the Court, which was composed of other Judges, (an election for these officers having intervened,) and inasmuch as they had not heard the case when argued at bar, as a matter of necessi-

ty, and to avoid the inconvenience of another argument on the merits, they resorted to the original briefs of the counsel in order to put themselves fully in possession of the case. There was no *new* brief to support the application for the re-hearing.

We desire to remark in this connection, that in view of the important principles of law decided in this case, and also in view of the heavy interest at stake, with a most anxious desire to detect any error that we may have inadvertently fallen into, we have, under these very peculiar circumstances, felt ourselves at liberty to depart from the strict, and, we think, proper practice, and have maturely considered the argument and authorities presented by the counsel for the applicant. But in thus acting, it has been with the distinct understanding among ourselves that if, in the investigation, we should see cause to waver as to our original conclusions, it would be appropriate to call for an argument from the other side. We trust, however, that this departure from strict practice will not hereafter be invoked as a precedent.

The application for a re-hearing of the cause is refused, and the petition ordered to be dismissed.

---

[The following opinion of PEARSON, J., on the case as first decided, did not reach the Reporter in time to be inserted in its place immediately following the main opinion, and is here inserted.]

PEARSON, J.:

Concurring as I do entirely in the opinion and judgment of the Court, I am nevertheless desirous of presenting some further views upon the question of domicil, which has been considered of so much importance in the determination of this cause.

Sundry distinctions have been taken in the books, in re-

gard to the various character and different descriptions of domicil, arrising under local statutes, and Mr. Phillimore, in his work on the subject of domicil, expresses with great propriety his regret that the term had ever been applied, in legal parlance, to any other than the domicil of succession, as regulated and defined by the great code of inter-national law. All other domicils are merely local, and prescribed by local laws, imposing certain duties, or con-ferring particular privileges, on the precise conditions of residence or inhabitancy which they define; and it is man-fest that the questions arising under these local laws, and the adjudications had thereupon, must turn upon their con-struction, and the duty imposed or privilege granted abide the result. With this class of cases we have, at present, nothing to do. Our enquiry is, what, by the law of civi-lized nations, constitutes such an incorporation of an indi-vidual with the mass of citizens of a particular State or country, as will make the local law of such State or coun-try the rule of succession to his personal estate.

Neither elementary writers nor learned judges have suc-ceeded in supplying a definition of this description of dom-icil which has generally obtained; and it would appear, upon a review of the authorities, that it would prove a much easier task to define what does not, than what does, constitute domicil of this sort. Without, therefore, at-tempting to furnish a definition, which jurists have not yet satisfactorily accomplished, we may venture to say, that the domicil of nativity, or of origin, remains until changed, and that three things must necessarily concur to effect such change:

*First.* The original domicil must be abandoned, in pur-pose and fact;

*Secondly.* A new domicil must be obtained, *de facto et animo;* and

*Thirdly.* There must be an intention to remain at the

new domicil an indefinite time, or, in other words, no present purpose of departure therefrom.

These several propositions are questions of fact, and are to be tested by the evidence, according to the rules of the common law. Each and all of them contain two elements, the one of external fact capable of the observation of the senses, the other of mental purpose, only to be reached by a full consideration of the significance of the acts done, the opinions and purposes disclosed in the writings and correspondence of the deceased, and the evidence of his oral declarations in relation to his intentions.

Guided by these principles, we proceed to the enquiry arising on the first point, whether Hardy B. Croom did actually *form and execute* the purpose of removing his domicil of succession from the State of North Carolina to the Territory of Florida. There being no imputation of fraudulent or sinister objects in the writings and correspondence of the deceased, and no direct impeachment of the credit and integrity of the witnesses, we may consider the testimony more or less valuable in the order in which it has been stated, and to be estimated accordingly.

What, then, upon a full survey of the vast mass of testimony presented to the Court, were the *acts done* by Hardy B. Croom, in reference to this alleged change of domicil? Such acts, if not conclusive in themselves, must necessarily be subject to the explanations afforded by simultaneous written and oral declarations on his part. We find that he was a native citizen of North Carolina, residing with his family at Newbern, in that State; that he was a gentleman of liberal education, and trained for the bar; that he derived a handsome fortune from his father, Wm. Croom, and intermarried with the daughter of Nathan Smith, of Newbern, by whom he received a considerable accession thereto; that he planted in Lenoir county, North Carolina, and once represented that county in the
26

Senate of his native State; that he had a taste for the nat-
ural sciences, and was particularly fond of botanical stu-
dies; that in the fall of the year 1831 he sold out his plan-
tation in Lenoir county, and in that and the following
year removed his plantation negroes to the Territory of
Florida, and purchased and settled a plantation therein,
where he planted with success ; that he spent much of his
time during the winters, subsequent to the removal of his
planting interest to Florida, in superintending that inter-
est, traveling south and west to see the country and choose
a home, and in pursuit of his favorite amusement of bota-
nizing; that in the years 1833 and 1834 he voted at the
territorial elections in Florida, but never removed his fam-
ily, his domestic servants and furniture to Florida, but
returned, after each annual visit to Florida, to them at his
original mansion house in Newbern, where they continued
to reside.

Upon this state of facts, without reference to further ev-
idence, it is contended that the act of voting in Florida
was conclusive on the question of domicil. But this is
not necessarily the case. Conceding that Mr. Croom was
a gentleman of integrity, the exercise of the elective fran-
chise, on his part, under the territorial law prescribing the
qualifications of voters in Florida, would only justify the
conclusion that he considered himself possessed of such
qualifications. It is simply an act equivalent to a decla-
ration on his part that he was thus qualified. Such decla-
ration, however formally announced, could not have been
conclusive even as to the *right to vote*, because Mr. Croom
was not the legally authorized and final judge of his own
qualifications as a voter, much less could it be conclusive
on the question of a domicil of succession, which might re-
quire other circumstances and conditions not imposed by
the local election law, to make out a case in conformity
with the public law. And, further, it may be safely as-

serted that even the most direct and positive declaration that one's domicil of succession was within a certain jurisdiction, could not conclude that question when it was unsupported by the facts and circumstances necessary to establish such domicil. That the effect of such declaration, even if made by Mr. Croom, would be in a great measure obviated by counter declarations made to the witnesses Burguin, Mrs. Winthrop and Mrs. Rice, in which Mr. Croom is not merely expressing his opinion of his rights as a voter in Florida, but declares expressly his intention of continuing his residence and domicil at Newbern. The cases which have been ruled upon the local statutes, it has been already shown, have no bearing upon this question, except in so far as a local statute may prescribe the same conditions, for some other purpose, which are necessary to be found, according to the *jus gentium*, to establish a domicil of succession. To this extent they are entitled to consideration, but no further. The history of our own Legislation, in relation to the qualifications of voters, may well illustrate this.

By the Act of Congress, approved the 30th March, 1822, establishing a Territorial Government in Florida, it is provided that the citizens of said Territory shall be entitled to one delegate in Congress; and, further, that "the said delegate shall be elected by such description of persons, at such times and under such regulations, as the Governor and Legislative Council may, from time to time, ordain and direct."

By virtue of such authority, the Legislative Council, by the 13th section of the Act of Feb., 1822, provide, "That all white male inhabitants, citizens of the United States, above the age of twenty-one years, who have resided in the Territory of Florida for the space of three months immediately preceding the day of election," may vote,—

Duval Comp. 347. It was under this act that, in May, 1833, and in 1834, Mr. Croom voted.

After the admission of the Territory as a State, by the Act of the General Assembly of 1846, (Thomp. Dig. p. 71,) new and far more restrictive qualifications of voters are prescribed. This act provides that " every free white male person of the age of twenty-one years and upwards, and who shall be, at the time of offering to vote, a citizen of the United States, and who shall have *resided and had his habitation, domicil, home, and place of permanent abode* in Florida for two years next preceding the election at which he shall offer to vote, and six months in the County," * * * " and who shall be enrolled in the militia thereof, unless exempted by law from serving in the militia," shall be deemed a qualified elector. It is apparent, upon the slightest comparative view of these statutes, that such " description of persons " as might have voted under the provisions of the act of 1833, could not exercise that privilege under the more stringent enactments of the statute of 1846 ; and that, although the latter act prescribes conditions which might fulfil the requirements for a domicil of succession on the part of a qualified voter under it, it by no means follows that the same consequence would result in behalf of one qualified to vote under the former act.

It is not then the mere right to vote, which may be conferred or withheld at the pleasure of the law-giver, and upon conditions light or onerous, still less is it the exercise of that right under a local election law of doubtful import, that can fix the domicil of succession. The act of voting, therefore, being in its very nature inconclusive on the question of domicil, does not impose upon the complainants, as suggested in the argument, the necessity of explaining it away upon the ground of fraud or mistake. It is but one among the many acts and declarations of the de-

ceased illustrative of his purposes and intentions, and should have its proper weight only in such connection.— But it should be considered that Mr. Croom was an educated lawyer, and that any manifestation of an actual abandonment of his domicil in North Carolina, to be deduced from his act of voting in Florida, must depend upon his own opinion of the question whether the exercise of such privilege in Florida amounted to a forfeiture of his domicil in North Carolina. There is nothing to show conclusively what were his views on this subject. But there is ample authority in the books, which will be cited hereafter, for the opinion that such would not have been the legal result. The hypothesis that he entertained this opinion, is more plausible than that he adopted a contrary view of the subject. His subsequent declaration of purpose to *remain* at Newbern until he found a better home, and his final determination to settle at Charleston, show this. The act of voting in Florida is therefore as inconclusive on the question of *intention* to abandon the original domicil, as it has been shown to be in relation to the *fact* of abandonment itself. The view of the argument in favor of the Florida domicil consists in a transposition of the order of events. There could be at the same time but one domicil of succession, and the abandonment and desertion of the existing domicil is a material and necessary condition precedent to the acquisition of a new one. But the argument reverses the natural order of events necessary to effect a change of domicil, and claims that by the exercise of the political privilege of voting in Florida, Mr. Croom acquired a domicil, and this worked, by legal intendment, a forfeiture and abandonment of his original domicil, and then proceeds, as in a circle, to claim that such abandonment of the former domicil is sufficient to establish a new one here. If the fact of voting then does not establish the further and material fact of the actual abandonment of the North Carolina domicil,

by what other *act* of Mr. Croom's is such abandonment made manifest? We look in vain through the testimony for any such act. His family and his homestead were never broken up and removed to the day of his death, whatever may have been his intentions, whether fixed and permanent, or vague and vacillating.

The right to vote might well have been conferred by a Territorial Council, acting under an organic law of Congress, from which it derived its sole authority, upon a citizen of the United States, on condition of a brief residence in the territory. The enactments of a Territorial Legislature emanate in effect from the Federal power, because it is the source of their authority and retains the power to annul them. The qualification of voters in the Territory of Florida, in the years 1833 and 1834, may well then be considered as having been sanctioned by Federal authority. The Territory had no existence as a State and no vote in Congress, and the entire argument, therefore, based upon the idea of State sovereignty and [a divided allegiance, has no application to the case.

In the history of the government, it is no new thing that citizens of the United States, and even aliens, should be permitted to vote in the territories. This practice commenced as far back as the Ordinance of 1787, and has been continued, under various circumstances, down to the late organization of the Kansas Territory. It was accorded to the Spanish population of Florida, under the treaty of cession, and soon after to all citizens of the United States upon three months residence therein. That the exercise of such privilege in Florida would not necessarily and by operation of law work a renunciation and forfeiture of a domicil of succession elsewhere, is sustained by the following authorities: 1 Curtis, 856; 2 Binn., 110–118; 2 Scam., 392; 10 Mass., 488; 3 Greenleaf; 11 Mass., 350; 10 Mass., 500–501; to the doctrine of which the authorities cited on the other side

are reconcilable. It does not appear then that Mr. Croom, by any positive act of his, either in fact or by legal intendment, renounced his original domicil in North Carolina, without which no new domicil could be acquired. And here we might well rest the argument. But, inasmuch as a most interesting history of Mr. Croom's life has been submitted to the Court in his correspondence and conversations with his family and friends, from the period of his first operations in Florida to the hour of his fatal embarkation with his family on the Home, it becomes necessary that it should be examined in order that it may appear whether it contains anything to give a new color or construction to the acts under consideration. The Court has given a very patient and full consideration to this history in all its bearings, and I am well content with its conclusions.